BETTY PAT INGRAM v. CHARLOTTE SOFLEY McCUISTON, AND CHARLES T. McCUISTON, AS GUARDIAN AD LITEM FOR LINDA LEE McCUISTON, MINOR.

(Filed 4 March 1964.)

1. **Evidence § 42—**

   The purpose of testimony of expert witnesses is to give the jury the benefit of opinions by experts upon factual situations of which the experts have no personal knowledge but which may be found by the jury from the evidence.

2. **Evidence § 51—**

   A hypothetical question may include only facts which are supported by evidence theretofore introduced, and should not contain repetitious, slanted, and argumentative words and phrases.

3. **Same—**

   A hypothetical question should not assume that plaintiff was in excellent psychological health prior to the accident when all of the evidence indicates plaintiff always had some nervousness; it should not assume plaintiff developed "suicidal tendencies" when the evidence discloses only mental depression; it should not assume injury to a part of the spine of which there was no evidence.

4. **Same—**

   A hypothetical question to an expert may not be predicated in whole or in part upon the opinions, inferences, or conclusions of another witness, either expert or lay, but may be predicated upon such opinions or conclusions only when the opinions or conclusions are in evidence and are assumed to be facts; it is error to include in a question to one medical expert a statement that at the time of the examination by another expert such other expert diagnosed plaintiff's condition in a certain manner.

INGRAM *v.* McCUISTON.

**5. Same—**

A hypothetical question relating to whether the accident could have caused specific physical injury to plaintiff's spine should not include facts assumed in regard to plaintiff's mental health.

**6. Same—**

A hypothetical question relating to whether plaintiff's injuries resulted in permanent mental or emotional injury should not assume the very facts sought to be established by the expert's opinion.

**7. Same—**

Hypothetical questions relating to whether the accident in suit caused specific injury to plaintiff's spine and permanent emotional injury should not contain references to plaintiff's childhood, the cost of medical bills, her consultation with another medical expert and his diagnosis, the route and manner of plaintiff's driving which brought her to the scene of the collision, or other entirely extraneous facts.

APPEAL by defendants from *Froneberger, J.,* May 20, 1963 Regular Civil "B" Session of MECKLENBURG, docketed in the Supreme Court as Case No. 242 and argued at the Fall Term 1963.

Plaintiff instituted this action to recover for personal injuries which she alleges she sustained on March 16, 1961 when the automobile of the defendant collided with the rear of her vehicle on South Tryon Street in the City of Charlotte. In broad outline the facts are these:

About 5:00 p.m. plaintiff, operating a Volkswagen, made a left turn from Woodlawn Road into Tryon Street, a two-lane roadway at that point. At the same time, the defendant Linda Lee McCuiston was approaching this intersection from the north on Tryon Street in a Dodge automobile owned by her mother, the other defendant. The distance of the Dodge from the intersection at the time of plaintiff's entrance is a matter of dispute between the parties. After plaintiff had proceeded south on Tryon Street in front of the defendant for about two hundred and sixty feet, she stopped three to four feet behind the last car in a long line of traffic which was waiting on a red traffic signal at the Yorkmont Road intersection approximately five hundred and twenty feet ahead. The defendant's Dodge then collided with the rear of plaintiff's Volkswagen causing it to strike the car immediately in front. Again the evidence is conflicting. Plaintiff contends she came to a gradual stop; defendant contends she stopped suddenly. In the two impacts plaintiff sustained an injury to her neck and back which, in the opinion of Dr. Robert E. Miller, the orthopedic specialist who treated her, resulted in a five percent permanent disability to her neck and thoracic spine. Plaintiff was "a nervous type individual," and at the time of the collision she was three months pregnant. She contends that her nervous condition

was so aggravated by the collision that in May 1962 she required psychiatric treatment. Plaintiff's psychiatrist, Dr. Thomas A. Wright, Jr., discharged her in August 1962 as much improved. In his opinion the emotional condition he observed in plaintiff at the time she was referred to him could have been produced by the automobile accident.

The pleadings and evidence raised issues of negligence, contributory negligence, and damages. The jury answered each in favor of the plaintiff and awarded her substantial damages. From judgment entered on the verdict the defendants appealed.

*Ralph C. Clontz, Jr., for plaintiff appellee.*

*Charles V. Tompkins, Jr. and Kennedy, Covington, Lobdell & Hickman for defendant appellants.*

SHARP, J. To establish the cause of plaintiff's injuries her counsel propounded to Dr. Miller, a hypothetical question which covers six pages in the record. The defendants' objections to this question, and to another which incorporated it by reference, were overruled. The defendants assign these rulings as error and contend that they were prejudicial because: (1) The question was based on assumed facts of which there was no evidence; (2) it was based in part on the opinion of another expert as to the plaintiff's condition; (3) it included assumed facts totally unnecessary to enable the doctor to form a satisfactory medical opinion; and (4) it was argumentative and unduly colored the evidence in plaintiff's favor.

We have concluded that in order to discuss appellants' contentions intelligibly we are forced to reproduce the hypothetical question here. It follows with paragraphs numbered for convenience of discussion:

(1)     Q. "Now, Dr. Miller, for the purpose of this hypothetical question, assuming that the jury finds the facts to be, from the evidence, and by its greater weight, that on March 16, 1961, and prior thereto, plaintiff Betty Pat Ingram was in excellent physical, emotional and psychological health, and suffering from no disability whatsoever, being an extremely active person from birth, having been brought up on a farm and actually worked in the fields, having held down a full-time job and being gainfully employed as of March 16, 1961; and that on March 16, 1961, at approximately 4:50 P.M., plaintiff Betty Pat Ingram was operating her husband's car, a 1960 Volkswagen, two-door sedan automobile, proceeding in a westerly direction on Woodlawn Road just inside the city limits of

Charlotte, Mecklenburg County, North Carolina, and approaching the intersection of Woodlawn Road and South Tryon Street.

(2)    "That the plaintiff *safely* brought her car to a complete stop on Woodlawn Road, in *lawful* obedience to a stop sign erected on said Woodlawn Road, directing traffic to stop completely before entering South Tryon Street, turning either left or right; and

(3)    "That the plaintiff, after first having observed that no traffic was approaching on South Tryon Street close enough or in such a manner as to interfere with her safely entering South Tryon Street, and thus after first observing that her actions would not affect the movement of any other vehicle, and having given a *proper signal* of her intention to turn to her left, did then *lawfully* make a left turn, entering South Tryon Street and thereafter proceeding south along South Tryon St., in the right-hand or westerly lane.

(4)    "Assuming, further, that the jury should find from the evidence and by its greater weight, that minor defendant Linda Lee McCuiston was operating her mother's 1950 Dodge and traveling in a southerly direction on South Tryon Street, here in Charlotte, also approaching the intersection of South Tryon Street and Woodlawn Road, at approximately 4:57 P.M.; and

(5)    "Further, that at the time mentioned herein, traffic was *extremely heavy* and practically bumper to bumper from the intersection of South Tryon Street and Woodlawn Road all the way down to the intersection of South Tryon Street or York Road and Yorkmont Road, and at which intersection there was located a red traffic light; and

(6)    "That, as plaintiff Betty Pat Ingram started her left turn and started proceeding into South Tryon Street, *she saw, and anyone who was properly observant could and should have seen,* that the traffic south of Betty Pat Ingram's vehicle was just barely moving and obviously preparing to make a stop, in obedience to the traffic control device aforementioned; and

(7)    "That, after the plaintiff had driven a very few feet south on South Tryon Street, she saw all of the cars, numbering between 15 and 20, south of her from a certain bridge on South Tryon Street all the way to the traffic signal aforementioned come to

a complete stop, at which time the plaintiff also began slowing down and preparing to stop behind the long line of traffic;

(8) "Assuming, further, that the jury should find from the evidence and by its greater weight that when the plaintiff started slowing down and preparing to stop, as aforementioned, the minor defendant, Linda Lee McCuiston, was directly behind the plaintiff's vehicle, some two or three or more car lengths north, traveling exactly the same direction in the same traffic lane; and

(9) "That the plaintiff had no difficulty in stopping her car and did stop her car three or four feet behind another vehicle operated by a Mr. Guy V. Soule, at a point near the center of the bridge on South Tryon Street, at which time the plaintiff was sitting with the brake pedal on her car completely and fully depressed; and

(10) "That a very short time after the plaintiff stopped her vehicle, *in obedience to the traffic control device and because of the traffic stopped ahead of her,* she observed the minor defendant approaching at a rapid rate of speed, but did not have time to brace herself properly before her car was struck, *and actually had no place to go in her car anyhow;* and that the minor defendant struck the rear of the 1960 Volkswagen with the front of her larger 1950 Dodge, with such force as to drive the plaintiff's automobile forward *and ram the same* into the rear of the vehicle in front of her, despite the locked brakes on the car; and

(11) "Assuming that the jury further finds from the evidence and by its greater weight that at the moment of the first impact, *when the defendant rammed the front of her car into the rear of the car the plaintiff was driving,* the car was suddenly thrown forward, with the result that the body of the plaintiff was thrown back, snapping and whipping her neck and upper portion of her body; and that at the time of the second impact when the front of the plaintiff's car was driven by the force of the defendant's car into the rear of the vehicle operated by Mr. Guy V. Soule, that that impact caused the plaintiff's body to be *sharply* thrown forward, again snapping her neck in the manner of a whip and, likewise, throwing her suddenly and *with great force* forward, at which time her abdomen sustained a *severe impact* with the steering wheel of the car the plaintiff was driving; and

(12)    "Further, assuming the jury should find from the evidence and by its greater weight that the accident and the two impacts aforementioned subjected the plaintiff to a *severe jolt and strain,* the force of the two said impacts producing immediately excruciating pain *and agony,* in the plaintiff's neck, back, shoulder and arms; and

(13)    "That at the time of the collision on March 16, 1961, the plaintiff had been pregnant for approximately three and a half months; and

(14)    "Assuming, further, that the jury should find from the evidence and by its greater weight, that whereas plaintiff had not suffered any substantial emotional difficulty or disability prior to the accident, that the collision and the separate impact, coupled with the pregnant condition of the plaintiff, proximately caused the plaintiff from the date of the accident through the entire remainder of her pregnancy, up until the child was born on September 2, 1961, or for a period of more than five months, *constant mental anguish and shock,* caused by the *reasonable fear* that her serious personal injuries and the blow to her abdomen might cause her to sustain a miscarriage; and

(15)    "Assuming, further, that the jury should find from the evidence and by its greater weight that the impact and the collision aforementioned subjected the plaintiff to *an extremely severe nervous and mental shock,* which permanently, to some extent, injured her nervous and mental systems, causing extensive and *permanent dislocation, psychoneurosis, nervous shock, nervousness, and traumatic neurosis or anxiety neurosis,* with the result that whereas plaintiff had never suffered such prior to the date of the accident, from the date of the accident and even for a considerable period of time after the birth of the plaintiff's baby, on September 2, 1961, the plaintiff suffered extremely from nightmares, worry and constant fear, and became in such a condition, as the result of the impact and the collision aforementioned, that she cried easily, became depressed and subject to suicidal tendencies; and

(16)    "That her emotional condition became such that her orthopedic specialist, Dr. Robert E. Miller, referred her to a duly accredited psychiatrist, Dr. Thomas H. Wright, Jr., which psychiatrist diagnosed her condition as being an extremely depressive reaction, with nervous tension and depression greatly

intensified since the date of the accident on March 16, 1961; and

(17)     "That at the time the psychiatrist first examined the plaintiff in June of 1962, he found the plaintiff to have lost interest in life, being unable to concentrate and at times even not wishing to live; and

(18)     "Assuming, further, that the jury finds from the evidence and by its greater weight that the plaintiff is still suffering emotional damage as the proximate result of the collision and the pain and suffering she endured, as above set out; and

(19)     "Assuming, further, that from the time of the accident on March 16, 1961, despite extreme pain suffered in the neck, shoulder, back and other portions of the body, it was unsafe and impossible, safely, to take X-rays of the plaintiff, due to her pregnant condition, which in turn increased her anxiety and mental anguish; and

(20)     "Assuming, further, that the jury should find from the evidence and by its greater weight that the plaintiff suffered from an extremely severe sprain of the cervical spine, thoracic spine, and the lumbar spine, and further, that the plaintiff presently is permanently partially disabled to the extent of 5% disability of said cervical spine, thoracic spine and lumbar spine; and

(21)     "That the plaintiff, as a proximate result of the accident and the injuries sustained in the accident, has incurred medical expenses to date in the sum of approximately $600.00, including the cost of drugs and prescriptions, the charges to the Miller Clinic, the charges of the psychiatrist, the charges of the Presbyterian and the charges of the x-ray specialist, the charges for a special corrective girdle and for a cervical collar prescribed by the Miller Clinic; and

(22)     "That the plaintiff would be likely to incur additional future medical expenses, directly attributable to her condition caused by the injuries; then

(23)     "Assuming that the jury finds the above facts to be true, from the evidence and by its greater weight, then do you have an opinion satisfactory to yourself, as to whether or not the accident in which the plaintiff was involved on March 16,

1961, when the plaintiff was stopped in her husband's auto-
mobile on South Tryon Street, sitting with her foot on the
brake, when the defendant *crashed* into the rear of the plain-
tiff's vehicle, *with tremendous force* and at a rapid rate of
speed, driving the vehicle forward, and actually knocking the
front of the plaintiff's vehicle into the rear of another vehicle,
with the two separate impacts first knocking the plaintiff's
body to the rear and then throwing the plaintiff's body to the
front, *striking her abdomen, with a severe blow,* she being then
and there three and a half months' pregnant, could or might
have produced the severe nervous and mental shock, which in-
jured her nervous and mental system, and further, could or
might have produced the extensive and permanent psychoneu-
rosis, nervous shock, nervous and traumatic neurosis, and fur-
ther could or might have caused the plaintiff to suffer from the
nightmares, worry and constant fear, the depression and be-
ing subject to crying easily and without reason and being sub-
ject to suicidal tendencies, and further, could or might have
produced the 5% permanent partial disability to the cervi-
cal spine, the thoracic spine and the lumbar spine." (Italics
ours).

The doctor answered that in his opinion the collision could or might
have produced the conditions described.

The next question was:

Q.   Dr. Miller, assuming that the jury finds the facts to be from
     the evidence and by its greater weight, as set out in the hypo-
     thetical question that was just put to you, do you have an
     opinion satisfactory to yourself as to whether or not the plain-
     tiff has sustained any permanent injury, mentally or emotional-
     ly, or whether she presently is still partially disabled from the
     standpoint of her mental health?

A.   Well, you have got an expert sitting back there in the Court.
     He can answer that question better than I can . . . Yes, I
     have an opinion. The question is, of course, in two parts. One
     is whether she has permanent partial disability from the emo-
     tional status and I think she does. The other is as to the
     permanent anxiety, and there is some permanency.

Under our system the jury finds the facts and draws the inferences
therefrom. The use of the hypothetical question is required if it is to
have the benefit of expert opinions upon factual situations of which the

INGRAM *v.* McCUISTON.

experts have no personal knowledge. However, under the adversary method of trial, the hypothetical question has been so abused that criticism of it is now widespread and noted by every authority on evidence. *E.g.,* Stansbury, N. C. Evidence, s. 137 (2d Ed. 1963); McCormick on Evidence, s. 16; Ladd, *Expert Testimony,* 5 Vand. L. Rev. 414, 427. Wigmore has urged that the hypothetical question be abolished: "Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justice Holmes' phrase) is much more than Logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of Evidence, should have become that feature which does most to disgust men of science with the law of Evidence." II Wigmore, Evidence, s. 686 (3d Ed. 1940). The comment contained in 2 Jones, Evidence, s. 422 (5th Ed. 1958) might well have been directed at the hypothetical question involved in this appeal.

> "The most meritorious of the criticisms are that the questions are often slanted for partisan advantage and are often so long and involved as to confuse rather than assist the jury, and, like some appellate court opinions, contain detailed recitals of factual surplusage not essential to support the conclusion reached."

To be competent, a hypothetical question may include only facts which are already in evidence or those which the jury might logically infer therefrom. *Jackson v. Stancil,* 253 N.C. 291, 116 S.E. 2d 817; Stansbury, N. C. Evidence, s. 137 (2d Ed. 1963) and cases therein cited. After a careful examination of the record, we find no evidence to support the following facts which were assumed in the hypothetical question involved on this appeal: (Figures in parentheses refer to correspondingly numbered paragraphs of the question.)

1. That the plaintiff "was in excellent physical, emotional, and psychological health," (1). All the evidence indicates that plaintiff had "always had some nervousness." Indeed, she told Dr. Miller that she was "an extremely apprehensive type individual."

2. That as a result of the collision plaintiff "became depressed and subject to suicidal tendencies," (15). There was ample evidence that plaintiff was abnormally depressed after the accident and during her entire pregnancy. However, there is no evidence either that she developed suicidal tendencies or that she lost the desire to live, as paragraph (17) of the question assumes the phychiatrist "found." Depression and suicidal tendencies are not necessarily synonymous.

3. "That the plaintiff presently is permanently partially disabled to the extent of 5% disability of said cervical spine, thoracic spine and lumbar spine," (20), (23). The evidence of such disability related only to the neck and thoracic spine. The doctor testified to no such disability in the lumbar spine.

Defendants' objection that the hypothetical question asked Dr. Miller, an orthopedic surgeon, was based in part upon the opinion of Dr. Wright, a psychiatrist, must also be sustained. Paragraphs (16) and (17) of the question reveal its reference to Dr. Wright's diagnosis of the plaintiff's condition "as being an extremely depressive reaction, with nervous tension and depression greatly intensified since the date of the accident on March 16, 1961." The question does not assume that plaintiff was actually suffering from an extreme depressive reaction; it merely states that Dr. Wright made this diagnosis. The inclusion of such a statement violates the rule in this jurisdiction that the opinion of an expert witness may not be predicated in whole or in part upon the opinions, inferences, or conclusions of other witnesses, whether they be expert or lay, unless their testimony is put to him hypothetically as an assumed fact. *State v. David*, 222 N.C. 242, 22 S.E. 2d 633. When the hypothetical question is properly asked the jury can determine whether the assumed facts have been proven and weigh the opinion of the expert accordingly. An excellent statement of this rule appears in *Quimby v. Greenhawk*, 166 Md. 335, 340, 171 A. 59, 61:

> "Although a medical expert may base his opinion upon the facts testified to by another expert, the witness may not have submitted to him, as a part of the facts to be considered in the formation of his inference and conclusion, the opinion of such other expert on all or some of the facts to be considered by the witness from whom the answer is sought. To do so would destroy the premises of fact upon which an expert, by reason of his own peculiar technical skill and knowledge, is permitted to give in evidence his own inference and opinion."

The purpose of the first hypothetical question asked Dr. Miller was to elicit his opinion whether the collision on March 16, 1961 could have produced the five percent permanent disability which he found in plaintiff's neck and thoracic spine. The references therein to plaintiff's mental health had no bearing on the query whether the collision might have caused the injury to her neck and thoracic spine.

The purpose of the second question, which incorporated the first, was to find out whether, in his opinion, the plaintiff had sustained any permanent mental or emotional injury. As Dr. Miller himself told coun-

sel, that question might have been more properly addressed to Dr. Wright, the psychiatrist. Furthermore, when paragraph (15) of the question stated that the collision on March 16, 1961 did proximately cause some "permanent dislocation, psychoneurosis, nervous shock, nervousness, and traumatic neurosis or anxiety neurosis," it assumed the very fact which plaintiff's counsel sought to establish by the doctor's opinion.

The references in the question to plaintiff's childhood on the farm, the route and manner of driving which brought her to Tryon Street immediately before the collision, her consultations with Dr. Wright and his diagnosis of her condition, the fact that her lumbar spine could not be X-rayed because of her pregnancy, and the cost of medical bills in the past and in the future were totally irrelevant to the question of causation. An examination of paragraphs (2), (3), (4), (5), (6), (16), (17), (18), (19), (21), and (22) discloses the validity of defendants' objection to the question on grounds that it contained an assumption of irrelevant facts. Each of the other paragraphs in question contain one or more references to facts which, more succinctly phrased, might be included in a properly stated question.

The italicized words in paragraphs (3), (6), (11), (12), (14), and (23) are examples of the repetitious, slanted, and argumentative words and phrases of which the defendants properly complain. It was no part of the legitimate purpose of the hypothetical question under consideration to establish defendants' negligence; nor are six pages required to state a proper hypothetical question based on the relevant evidence in this case. A shorter question should be no more difficult to frame and it will be easier for the court to rule upon and the jury to understand.

Defendants' assignments of error based on their objections to the hypothetical questions must be sustained. Since the case goes back for a new trial, it is not necessary to consider the other assignments involving questions which may not arise thereon.

New trial.