Long v. Clutts

SHIRLEY D. LONG, ADMINISTRATRIX OF THE ESTATE OF BRUCE E. LONG, DECEASED v. GEORGE R. CLUTTS, M.D., H. JOHN BRADLEY, M.D., W. RALPH DEATON, JR., M.D., JOHN A. LYDAY, M.D., JOHN A. MOORE, M.D., AND THE WESLEY LONG HOSPITAL, INC., A CORPORATION

No. 7218SC637

(Filed 25 October 1972)

1. **Appeal and Error § 49— exclusion of evidence — pertinent issue not reached**

    The plaintiff in a wrongful death action was not prejudiced by the exclusion of a medical bill where the jury did not reach the issue of damages.

2. **Evidence § 49— hypothetical question — explanation of answer — facts not referred to in question**

    In a malpractice action, the trial court did not err in striking those portions of an expert witness' explanation of his answer to a hypothetical question which were not referred to in the facts contained in the hypothetical question.

3. **Death § 7— drinking habits of decedent — damages**

    In a wrongful death action based on the alleged malpractice of two physicians, testimony by a nurse as to what decedent had told her with respect to his drinking habits was competent for consideration by the jury on the issue of damages.

4. **Evidence § 49— hypothetical question — form**

    Failure to preface one of the many hypothetical questions with the requirement that the facts stated must be found by the jury "from the evidence and by its greater weight" did not constitute prejudicial error.

5. **Appeal and Error § 24— form of assignments of error**

    An assignment of error must show what question is intended to be presented without the necessity of going beyond the assignment of error itself.

6. **Physicians and Surgeons § 16— malpractice — negligence — limitation to activities on two dates**

    In a wrongful death action based on the alleged malpractice of two physicians, the trial court did not err in permitting the jury to consider defendants' activities only on two specified dates on the issue of negligence, although the allegations of the complaint encompassed a greater span of time, where all of plaintiff's evidence was directed to diagnosis and treatment on those two dates, and the theory of plaintiff's case was that treatment on those dates was the proximate cause of subsequent shock and renal failure which resulted in decedent's death.

APPEAL by plaintiff from *Exum, Judge,* 17 January 1972 Civil Session, Superior Court, GUILFORD County.

This action for damages for physical suffering and mental anguish, medical expenses, and wrongful death of Bruce Long was brought against Dr. George R. Clutts, Dr. H. John Bradley, Dr. W. Ralph Deaton, Jr., Dr. John A. Lyday, Dr. John A. Moore, and The Wesley Long Hospital, Inc. At various stages of the trial plaintiff took a voluntary dismissal as to all defendants except Drs. Clutts and Moore.

Plaintiff alleged that "prior to December 1968 Bruce E. Long came under the consultation, advice, care, diagnosis and treatment of the defendants. As a result of such consultation, advice, care, diagnosis, and treatment, he was advised to and underwent three operative procedures . . . : November 21, 1968, cysto stone manipulation; November 25, 1968, cholocystectomy; and December 6, 1968, exploratory laporatomy." "The defendants, and each of them, were so negligent in the advice, care, consultation, diagnosis and treatment that was given, and were so negligent in the pre-operative, operative and post-operative procedures that were followed, and were generally so negligent in the premises that as a proximate result of all such negligence said Bruce E. Long died on January 1, 1969."

The evidence, summarized briefly, follows: On 15 November 1968, Bruce Long went to the office of Dr. Moore, his personal physician, suffering abdominal pain. Dr. Moore diagnosed his difficulty as renal colic and admitted him to the hospital. X-rays revealed a shadow in a position which was consistent with a kidney stone in the tube which runs from the kidney to the bladder. Dr. Bradley, a urological specialist was called who removed a stone from Long's lower right ureter. This procedure was accomplished without incision, but Long was placed under general anesthesia. Prior to this procedure blood work-up and other laboratory studies had been done. Recovery was uneventful in that he had no more of the pain related to the kidney stone. He did have intermittent discomfort located in the upper abdomen and lower chest which he had had for an indeterminate period of time. After observation and tests this was diagnosed as caused by gall bladder stones. Dr. Clutts was called in and examined Long on 22 November. Dr. Clutts discussed the surgery with Long, who signed a consent form for the operation, which was not an emergency but an elective procedure. Dr. Clutts did not order any laboratory work done prior to surgery on 25 November. The blood work done prior to the urological procedure showed 14.6 hemoglobin, essentially normal; 9.4

white count; hematocrit of 44; 1 eosinophil; 22 lymphocytes; 73 segs—all normal. He had repeated EKG tests, all normal. He had an SMA-12 test where blood was analyzed in a machine for 12 things. Everything was normal. These included tests of his kidney and liver. There was no indication of anything wrong with either. He had a serology test. It was normal. He had a urine culture and sensitivity test. On 17 November he had a SGOT test, essentially normal for his heart. It was repeated on 18 November. On 20 November there was another urinalysis, revealing 10 to 20 red blood cells, some amorphus strands, 10 milligrams of albumin, all compatible with the ureteral stone he had had but indicating nothing wrong with his kidneys or liver. A urine culture done 21 November showed no growth in 48 hours. That was the last test done before surgery. No one made any tests before surgery on Long of his bleeding time or to determine any clotting factors. No prothrombin test was made. This test is a measurement of the amount of prothrombin in the blood. The ideal figure is to have 100%. Prothrombin helps blood to clot. Prior to, during, and after surgery the patient's blood pressure was within fairly normal ranges. Surgery revealed that the gall bladder contained multiple stones. It was removed and hemostasis, control of bleeding, was obtained. A drain was placed in the area beneath the gall bladder so that any bile or blood drainage would drain to the outside of the body. Dr. Clutts then removed Long's appendix, closed the peritoneum, and the patient was returned to the recovery room, at which time his pulse and respiration were normal. Twenty minutes after the operation, Dr. Clutts saw Long in the recovery room. There was no significant change in his vital signs. He saw him again at 5 o'clock p.m. His blood pressure was lower than normal. The dressing was dry. Long was complaining of pain. At 5:30 his blood pressure was 86 over 56—"lower than we would anticipate, but not dangerously low." Medication to elevate the blood pressure was administered. By 7:00 p.m. it had dropped to 66 over 28. This was considered by Dr. Clutts to be dangerously low. Long's skin was cool, clammy, and pale. He was perspiring. His respirations were somewhat increased. A blood count was ordered which, to Dr. Clutts, did not show hemorrhagic shock. Dr. Clutts did not then know what kind of shock he had. His temperature was slightly elevated. Dr. Clutts was called back to the hospital at 7:20 p.m. There was slight to moderate red drainage on the dressing which he changed. Dr. Moore was called. The two in

consultation arrived at a diagnosis that the lowered blood pressure was from endo-toxic shock and not hemorrhagic shock. An antibiotic was ordered as was a transfusion. No blood culture was taken for the reason, according to Dr. Clutts, Long had been on antibiotics and a culture probably would not grow organisms and in any event it would take 48 to 72 hours to get the culture. Hemoglobin dropped to 12.8. Long could have withstood surgery but Dr. Clutts did not think it was indicated. The high white blood count of 44,000 was to Dr. Clutts the most important indication of endo-toxic shock. A recount that evening showed 39,000. Ten days later, on December 5 when Long had had massive doses of antibiotics, Dr. Clutts ordered a blood culture to try to find an organism which might be causing the difficulty. Three days later a report of no bacterial growth resulted. On the night of November 25 there was an emergency—Long's life was threatened. They had no evidence of hemorrhage on the dressing and around the drain. In Dr. Clutts's opinion, if this had been endo-toxic shock and they had re-operated, the operation and the anesthetic could have been fatal to him. Between November 25 and the end of November 26 at midnight, he received three pints of blood. The first time Dr. Clutts suspected bleeding was on the evening of November 26 when his hemoglobin showed 10 grams. He was given two pints of blood, having already had one pint. On 25 November his liver was in pretty good shape. Several days later it was more impaired. No vitamin K was administered until Friday night. It was done by Dr. Lyday who had evidence of bleeding from the wound and did it to aid clotting. The first prothrombin test on Long was several days after surgery. It was 40%, 100% being normal. On 5 December he again went into shock. Although he had been able to walk in the halls during the day, his temperature at about 8:00 p.m. went to 105. Drainage from his abdomen was more. He was treated with massive doses of antibiotics. His blood pressure fell from the normal it had held since 26 November. He had a white count of 75,000. Hemoglobin dropped to 12.5. He was given a transfusion and Dr. Morris was called in. Bleeding was suspected. The next morning they were able to diagnose it by the large amount of drainage from around the drain. It was evident he had intra-abdominal bleeding, and early on 6 December, exploratory surgery was done and a large amount of blood was found in his peritoneum. Most of this was fresh blood. An arterial spurter was found and this was

ligated. Following this, his blood pressure gradually rose over the period of the next few hours. He continued to have fever despite the antibiotics he was getting. For the first 24 hours he had good urinary output. The next day, it had decreased and the next day there was a marked decrease. Dr. Joyner saw him with Drs. Clutts, Moore and Bradley. Because of the signs of impending kidney failure, he was transferred to Duke Hospital under the care of Dr. Portwood. When he arrived at Duke, his vital signs were normal. During the three weeks at Duke, he was placed on the artificial kidney ten times. Five days after admission, (on 15 December) he had a severe reduction in blood pressure and increase in temperature. Transfusions were given and he stabilized. On 21 December, he went into shock. Surgery was done and he was found to be bleeding from an area of the abdomen. After correction of this situation, he again stabilized. On 26 December he again went into shock and another exploratory operation was done. Ulcers were found within his stomach. From that point on to his death on 1 January 1969 there was continuous bleeding from his stomach. Dr. Portwood testified that the cause of death was shock secondary to hemorrhage. In his opinion, Mr. Long's renal failure was secondary to shock prior to the patient's transfer to Duke Hospital.

Plaintiff's expert witness testified that in his opinion Bruce Long could have been hemorrhaging post-operatively on 25 November and early on 26 November; that diagnosis of bleeding could have been enhanced by a complete blood work-up and studies at a time nearer surgery than 16 November; that tests showing bleeding tendency and clotting time should have been given prior to surgery; that a blood culture taken shortly after he went into shock could have enhanced diagnosis; that hemorrhage was the only possible cause of shock on 25 and 26 November and Bruce Long could not have been in endo-toxic shock; that the liver and kidney disfunctions noted on 26 and 27 November could have been caused by hemorrhage and its consequences; that the 5 and 6 December hemorrhage and shock and further impairment of renal and liver functions could have been avoided by timely surgical intervention to stop the hemorrhage between 25 and 26 November; that Mr. Long on 5 and 6 December re-bled from the same vessel that caused him to have his hemorrhagic shock on 25 and 26 November; that the hemorrhage on 25 and 26 November and the failure to

re-operate to stop the hemorrhage initiated a chain of circumstances that led to re-bleeding on 5 and 6 December, further hemorrhage, further shock, further insult to the kidneys and to the liver which culminated in his death on 1 January 1969; and finally that "in the exercise of the care and diligence that a reasonable practitioner, acting under the same or similar circumstances would have exercised, the defendants should have elected surgical intervention between 25 and 26 November 1968, in the application of their knowledge and skill in Mr. Long's case."

On the other hand, defendants' expert witnesses testified that in that community prothrombin test was not given prior to surgery absent some clinical indications of liver involvement or absent some reason to suspect the patient had not been eating; that under the circumstances confronting the doctors at the time, the treatment given Bruce Long on 25 and 26 November was in conformity with approved medical practices employed by physicians and surgeons in that and other similar localities and communities; that the decision that was reached by the doctors, that the patient's condition was one of septic shock, was a logical one; that the bleeding which occurred on 5 and 6 December was not related to nor caused by the manner in which the patient was treated on 25 and 26 November; that the abnormality of the kidney function began as a result of the episode on the night of 5 December and morning of the 6th and not as result of any treatment of 25 and 26 November nor was it related to that episode; that after the bleeding stopped on 26 November, surgery should not have then been performed.

The matter was submitted to the jury who answered the issue of negligence in favor of defendants. Plaintiff appealed.

*Cahoon and Swisher, by Robert S. Cahoon, for plaintiff appellant.*

*Jordan, Wright, Nichols, Caffrey and Hill, by Welch Jordan and William B. Rector, Jr., for defendant appellee John A. Moore, M.D.*

*Perry C. Henson and Hubert E. Seymour, Jr., by Perry C. Henson, for defendant appellee, George R. Clutts, M.D.*

MORRIS, Judge.

[1] Plaintiff brings forward and argues ten assignments of error. No. 1 is directed to the exclusion of certain medical bills, primarily the bill from Duke. It is apparent that in presenting medical bills as exhibits, plaintiff did not use the same designations given to them in the pretrial order, and there was confusion at the time of their introduction because of the mixup in designations. It is not clear from the record what the court's ruling as to the Duke bill was. However, that was clarified at the end of the evidence. The court announced that he wanted to get the medical bills straight. During that discussion he specifically inquired about the Duke bill, was told that it was Exhibit H, and was in the amount of $7,828.50. Whereupon the court said: "Let the record show that I am allowing that exhibit number if I earlier excluded it. I am not sure whether I did or not." At this time, plaintiff went into all the medical bills and was in agreement with counsel and the court as to those admissible and the amount thereof. Even if plaintiff's present contentions were correct, we can perceive no prejudice since the jury did not reach the question of damages. This assignment of error is overruled.

[2] Plaintiff next contends that the court erred in excluding evidence offered by plaintiff through her expert witness, Dr. Wandling. The witness had answered a hypothetical question and was explaining his answer. Defendant moved to strike those portions of the explanation which were not referred to nor included in the facts contained in the hypothetical question. The court properly sustained the motion. Again, plaintiff was not prejudiced. The witness was attempting to explain his answer by ruling out pulmonary embolus and heart difficulties as possible causes of Mr. Long's condition on 25 and 26 November. There was evidence before the jury that chest x-rays and electrocardiograms had revealed no evidence of coronary difficulties or pulmonary embolus. Those facts, however, were not included in the hypothetical question. Striking these references from the witness's answer did not preclude plaintiff from further questioning him if she wished to emphasize that evidence.

[3] Plaintiff next contends that the court committed prejudicial error in allowing a nurse to testify, over plaintiff's objection, to what Mr. Long had told her with respect to his drinking habits. The evidence was proper for the jury to

consider on the issue of damages. *Journigan v. Ice Co.*, 233 N.C. 180, 63 S.E. 2d 183 (1951). It appears from the record that to interrogatories served on each defendant, the defendants stated that alcohol had nothing to do with his condition. Plaintiff was at liberty to make this information available to the jury. The jury, however, did not reach the issue of damages, and plaintiff has not been prejudiced by the admission of this evidence.

[4]  By assignments of error Nos. 4, 5, 6, 7 and 8, plaintiff contends that the court erred in overruling her objection to the hypothetical question asked the medical experts testifying for defendants. The question was a long one, as hypothetical questions usually are. The witnesses had had the advantage of having a copy to study prior to their testimony. Certain additions were made and one sentence stricken. In each instance, the witness testified that he was aware of the changes and had had time to familiarize himself with the facts recited. The question itself was introduced as an exhibit for the purpose of clarity and in the interest of not consuming more trial time than necessary. Plaintiff agreed to this procedure. Her primary objection seems to be her contention that the expert witnesses were allowed and instructed to consider the results of SMA-12 tests given on 26 and 27 November when the results were not before the jury. A study of the record, however, reveals that evidence with respect to the SMA-12 tests was given with particularity by Dr. Deaton, and Dr. Moore, and the items shown by the tests and the results of each were read to the witness in the presence of the jury. Further the record contains the following statement by plaintiff's counsel with respect to the hypothetical question marked as defendant Clutts's Exhibit No. 1 "We wish to point out that this does not include quite all the results of the SMA-12 test taken on November twenty-sixth and twenty-seventh, and we have stipulated that this can be included by the witness as long as he is also instructed in the hypothetical to consider all the results of those two SMA-12 tests which were in the Wesley Long Hospital record in evidence, and as long as that is made a part of the hypothetical question, we will stipulate, without waiving our objection to the form of the question and the question itself, that he can be asked the question by written form." Plaintiff also points out that in a hypothetical question asked Dr. Myers, counsel prefaced his question "If the jury should find that . . . " without the

requirement "if the jury should find from the evidence and by its greater weight." This the plaintiff contends constitutes prejudicial error entitling her to a new trial. We do not agree. In this trial counsel for both plaintiff and defendants asked numerous hypothetical questions. We note that one of plaintiff's hypothetical questions consumes five pages of the record and is subject to the same criticism she contends constitutes prejudicial error. We certainly agree with plaintiff that the witness's opinion should be based on the hypothesis that the facts stated will be found by the jury to be true by the greater weight of the evidence. Nevertheless, we cannot say that defendants' omission of a portion of this requirement from only one of many such questions constitutes error sufficiently prejudicial to warrant a new trial.

In *Ingram v. McCuiston*, 261 N.C. 392, 399-400, 134 S.E. 2d 705 (1964), Justice Sharp said:

"Under our system the jury finds the facts and draws the inferences therefrom. The use of the hypothetical question is required if it is to have the benefit of expert opinions upon factual situations of which the experts have no personal knowledge. However, under the adversary method of trial, the hypothetical question has been so abused that criticism of it is now widespread and noted by every authority on evidence. E.g., Stansbury, N.C. Evidence, s. 137 (2d Ed. 1963) ; McCormick on Evidence, s. 16; Ladd, *Expert Testimony*, 5 Vand. L. Rev. 414, 427. Wigmore has urged that the hypothetical question be abolished: 'Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justice Holmes' phrase) is much more than Logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of Evidence, should have become that feature which does most to disgust men of science with the law of Evidence.' II Wigmore, Evidence, s. 686 (3d Ed. 1940)."

Defendants' primary hypothetical question covers 12 pages of the record. Plaintiff's primary hypothetical question covers five pages of the record. Despite their length, we are of the opinion that they sufficiently meet the tests set out in Stans-

bury, N.C. Evidence, § 137, pp. 331-334. See also *Ingram v. McCuiston, supra.* We have considered all of defendants' objections and contentions with respect to the hypothetical questions and, even conceding that technical error may appear, we find none sufficiently prejudicial to warrant a new trial.

[5] Finally plaintiff contends that the court erred in its charge to the jury. Plaintiff notes ten exceptions to the charge. These exceptions are assigned as error by assignment of error No. 9. Both in her assignments of error and her brief, plaintiff simply quotes the portions of the charge to which exception is taken with a reference to the record page on which that portion may be found. It has repeatedly been said that an assignment of error must show specifically what question is intended to be presented for consideration without the necessity of going beyond the assignment of error itself. *Lewis v. Parker,* 268 N.C. 436, 150 S.E. 2d 729 (1966). In her brief plaintiff for argument says: "The plaintiff points out that the charge, in the portions reproduced above, and as a whole (R. pp. 377-396), while in many respects a respectable dissertation upon law, is remarkably deficient in setting forth the contentions of the plaintiff and in calling to the jury's attention the evidence in the case and in applying to that evidence, for the guidance of the jury, the applicable law." We assume that plaintiff contends the court erred in failing to charge the law and explain the evidence as required by statute. This is, of course, a broadside exception and will not be considered. 1 Strong, N.C. Index 2d, Appeal and Error, § 31, and cases there cited.

[6] In addition to the above, plaintiff argues that the court "unduly narrows the time and activity of the defendants which the jury might consider negligent to November 25 and 26, 1968." Despite the ineffectiveness of plaintiff's assignment of error, we recognize, of course, the importance of this litigation, and, therefore, address ourselves to this question. It is true that the allegations of the complaint encompass the span of time from Mr. Long's admission to the hospital to the time of his death. However, all of plaintiff's evidence as to negligence was directed to the diagnosis and treatment of 25 and 26 November. The hypothetical questions asked the expert witnesses were so limited. The theory of plaintiff's case was that the negligence of defendants in diagnosis and treatment on 25 and 26 November was the proximate cause of the subsequent shock on 5 and 6 December and resulting renal failure. We are of the

opinion and so hold that the court did not err in limiting the jury to 25 and 26 November in its deliberations as to negligence.

This trial consumed some 11 days. All parties were well represented by competent counsel both at trial and on appeal. Abundant evidence was presented to the jury who, after deliberation, found that defendants were not negligent. In the trial we find

No error.

Judges BROCK and HEDRICK concur.