BARBARA L. LINDSEY v. THE CLINIC FOR WOMEN, P.A.; DR. A. H. WESTFALL AND DR. HUGH McALLISTER, INDIVIDUALLY

No. 7716SC927

(Filed 3 April 1979)

1. **Rules of Civil Procedure § 50.3— directed verdict—necessity for stating grounds in motion**

    Though G.S. 1A-1, Rule 50(a) provides that a motion for directed verdict shall state the specific grounds therefor, the courts need not inflexibly enforce the rule when the grounds are apparent to the court and the parties; in this case it was obvious that the motion was made on the grounds that the evidence was insufficient to show actionable negligence on the part of defendants, and the court on appeal therefore elects to review the trial court's action in denying defendants' motion.

2. **Physicians, Surgeons and Allied Professions § 20— stillborn child—failure to show connection between injury and defendants' action or inaction**

    In an action to recover damages for medical malpractice where plaintiff alleged that her child was stillborn, having died of amnionitis which went undetected by defendants, the trial court erred in denying defendants' motion for directed verdict, since, even if plaintiff's evidence was sufficient to support her allegation, there was nevertheless no evidence that anything which defendants did or failed to do in the course of their care of plaintiff either caused or could have prevented amnionitis.

3. **Rules of Civil Procedure § 50.5— directed verdict for defendants improperly denied—new trial granted plaintiff appellee**

    Where the trial court erred in denying defendants' motion for directed verdict and defendants made a timely motion for judgment n.o.v., the court on appeal was not required to direct entry of judgment in accordance with the motion, but could grant plaintiff appellee a new trial.

4. **Evidence § 49.3— medical testimony—hypothetical questions—improper form**

    The trial court in a medical malpractice action erred in overruling defendants' objections to hypothetical questions which were unduly long and prolix, contained references to matters which were irrelevant to the purposes for which the questions were asked, and failed to include references to matters which were highly relevant.

APPEAL by defendants from *Preston, Judge.* Judgment entered 3 June 1977 in Superior Court, ROBESON County. Heard in the Court of Appeals 22 August 1978.

This is a civil action to recover damages for medical malpractice. On 13 June 1974 plaintiff was delivered of a stillborn child. She was a patient of the defendants, Dr. Westfall and Dr. McAllister, who were physicians specializing in obstetrics and gynecology in Lumberton, N. C. In her complaint plaintiff alleged that her child was stillborn and that she suffered great pain and mental distress as a direct and proximate result of defendants' negligence in failing to attend and examine her diligently, in failing to make a proper diagnosis, in failing to provide proper treatment for a breech birth, and in failing to comply with the recognized standard of medical care exercised by licensed physicians in the same specialty in similar circumstances in the general area in which defendants practiced. Defendants answered, admitting they provided plaintiff prenatal treatment and care but otherwise denying the material allegations of the complaint and alleging that at all times in their examination, care, and treatment of the plaintiff they exercised their best skill and judgment.

At trial plaintiff presented evidence to show the following. In September 1973 plaintiff, a married woman with three children, again became pregnant. She consulted defendant doctors and they agreed to provide her with care in connection with her pregnancy, such care to include all office visits, delivery of the child, and postnatal treatment. For these services defendants told her they would charge $220.00, which she paid. She had experienced no difficulty with her prior pregnancies, and at first this pregnancy was uneventful. She made all regularly scheduled visits to the clinic and was examined by defendants. On 29 May 1974 she was examined by the defendant, Dr. Westfall, who told her she had begun to open up just a little and that the birth of the child could be at any time. At that examination she was found to weigh 188½ pounds. On 3 June 1974, at about 9:00 p.m., she experienced a leakage of fluid. About an hour later she experienced a sudden gush of water, approximately three or four quarts in amount. She went to bed, expecting labor pains to begin at any time. They did not. The next morning she phoned the clinic and told the defendant, Dr. McAllister, that her water broke the night before. He asked when her next appointment was, and when she told him it

was the following day he told her, "Pack your bags, get off your feet; come in tomorrow for your checkup." On 5 June she went to the clinic, where she was weighed by the nurse and it was found her weight had dropped to 183½ pounds. She was examined by Dr. Westfall. He asked if she could feel the movement of the baby, and she told him she could. The doctor's examination took approximately two to four minutes. He did not take her temperature or tell her that she should do so. She was not in any pain at that time, and the doctor gave her no medication. He told her it wasn't quite time for her baby to be delivered and for her to come back on Friday, 7 June. She left the clinic on 5 June and went home and to bed. She was in no pain at that time. While she was being examined by Dr. Westfall on 5 June was the last time she felt the baby move.

On the following day, 6 June 1974, at about 5 o'clock in the afternoon, she started having sharp pains in the bottom of her stomach. She was also having a bloody discharge from her vagina, which she had first noticed right after she had left the doctor's office on the preceding day. On the morning of 7 June her pains were about ten minutes apart. She also noticed a thick green and black substance lying on the water of the commode when she used the bathroom. In the early morning of 7 June she went to Dr. McAllister's office, taking her suitcase with her. She told the nurses she was in labor, was having a green and black discharge, and also had a bloody discharge. Her weight had fallen to 180 pounds. Dr. McAllister examined her, told her she was having false labor, that he could not touch the baby, and that if he put her in labor it would take the baby's life. He told her to come back in one week. His examination took from two to four minutes. At this time she did not feel the baby move. Following the doctor's advice, plaintiff went home.

On 8, 9, and 10 June plaintiff continued to have severe pain and to experience the green and black discharge. On 11 June she suffered so badly with labor pains that she called the clinic to beg for help. She phoned three times and talked with the receptionist or nurse. She asked to talk to the doctor but did not get the privilege of talking to either doctor. The defendant doctors did not return any of her calls.

On the following day, 12 June, she started suffering so much that she did not feel she could suffer any more. Without an ap-

pointment, she went to the clinic, arriving about 2 or 2:30 in the afternoon. Dr. McAllister examined her and sent her to the hospital to take an x-ray. The x-ray was taken about 3 o'clock in the afternoon. At 3:30 she was admitted to the hospital. About 5 or 5:30 Dr. McAllister checked her at the hospital for the baby's heartbeat. He told her it was going to be a breech birth and that a Doctor Brown, who she did not then know, would deliver her baby. She continued to have pain. The hospital nurse's notes indicated that no fetal heart tone was heard at 11:30 or at 11:55 p.m. Later that night she was taken to the delivery room, where Dr. Brown attended her. In the early morning of 13 June her child was stillborn. Dr. Brown's delivery notes included a notation that "at delivery pt. had prolapsed cord tight around right thigh of infant; severe amnionitis with gross pus noted when head delivered, running from the vagina." Plaintiff's evidence also showed that the skin of the stillborn child was macerated and was not normal in color. The baby's death certificate listed the cause of death as the prolapsed umbilical cord with amnionitis as a possible contributing condition.

Plaintiff remained in the hospital until 24 June. While in the hospital she continued to suffer pain. After leaving the hospital she used crutches and continued to experience pain. As time went on, the pain grew lighter.

Plaintiff presented the testimony of Dr. Joseph May, an Associate Professor of Obstetrics and Gynecology at the Bowman-Gray School of Medicine, who was accepted by the court as an expert in the field of obstetrics and gynecology. In response to hypothetical questions, Dr. May was permitted to testify over defendants' objections that in his opinion the black and green substance which plaintiff discharged on 7 June was meconium, which he described as a substance contained in the lower intestinal tract of an unborn fetus at or near term and which he testified cannot escape from the fetus without the mother's membrane having first been ruptured; that plaintiff's membranes ruptured on 3 June when she experienced the sudden gush of water; that plaintiff's deceased fetus might have died from infection; that plaintiff's prolonged recovery and pain might have been caused by amnionitis, which he described as an infection of the amnion or membrane lining of the pregnant womb; and that the course pursued by defendant doctors in this case did not conform with ap-

proved medical practices and treatment by physicians specializing in the field of obstetrics and gynecology in Lumberton, N. C. Dr. May also testified that in his opinion skin maceration will not occur unless a fetus has been dead for a minimum of twenty-four to forty-eight hours.

The defendants presented the testimony of the defendant doctors, Dr. Westfall and Dr. McAllister, and of Dr. Brown. Defendants' evidence showed that when plaintiff was examined on 5 and 7 June, there was no evidence of any rupture of her membranes, no dilation of the cervix, and fetal heart tones were good. In the opinion of the examining doctors she was not in real labor at that time. Dr. McAllister's examination of plaintiff on 12 June for the first time indicated that plaintiff's cervix was beginning to open, signifying the beginning of labor. Plaintiff was promptly sent to the hospital. Dr. McAllister's examination on 12 June also revealed a good, strong fetal heart beat. At the hospital on 12 June fetal heart beat was determined and recorded by the hospital nurses at 4:15 p.m. and again at 8 p.m. Dr. Brown, the delivering physician, examined plaintiff at approximately 6:30 p.m. on 12 June and found no indication of any fever. Only once thereafter during plaintiff's stay in the hospital did her temperature reach 100 degrees, that being four days after delivery, and there was never a temperature recorded during her hospital stay which showed any evidence of infection. Plaintiff was delivered of a stillborn infant at 12:40 a.m. on 13 June by a breech extraction. The umbilical cord was wrapped tightly around the infant's leg. The child's skin was not macerated. In Dr. Brown's opinion the tightened cord caused the infant's death and would have killed the infant without amnionitis.

The court directed verdict for the defendant, The Clinic for Women, P.A.

The jury answered issues finding that plaintiff was injured by the negligence of the defendants, Dr. Westfall and Dr. McAllister and awarded damages in the amount of $200,000.00. From judgment on the verdict, defendant doctors appealed.

*Daughtry, Hinton & Woodard by N. Leo Daughtry and W. Kenneth Hinton, attorneys for plaintiff appellee.*

*Anderson, Broadfoot & Anderson by H. W. Broadfoot, attorney for defendant appellants.*

PARKER, Judge.

[1]   Defendants first assign error to the denial of their motion for a directed verdict made when plaintiff rested her case and renewed at the close of all of the evidence. Plaintiff contends that this assignment of error should be disregarded because defendants failed to state the grounds for their motion as required by G.S. 1A-1, Rule 50(a). That rule provides that "[a] motion for a directed verdict shall state the specific grounds therefor." We have held this provision to be mandatory. *Wheeler v. Denton,* 9 N.C. App. 167, 175 S.E. 2d 769 (1970). "However, the courts need not inflexibly enforce the rule when the grounds for the motion are apparent to the court and the parties." *Anderson v. Butler,* 284 N.C. 723, 729, 202 S.E. 2d 585, 588 (1974). In the present case it seems obvious that the motion was made on the grounds that the evidence was insufficient to show actionable negligence on the part of the defendants. This must have been apparent to the court and to the plaintiff. Certainly nothing in the record suggests to the contrary. Therefore, we elect to review the trial court's action in denying defendants' motion. In the trial court's ruling, we find error.

[2]   Plaintiff's theory of this case, as expressed in her brief and by her counsel on oral argument, is that, viewing the evidence in the light most favorable to the plaintiff, it was sufficient to warrant a jury in finding the following facts. Defendants, physicians specializing in obstetrics and gynecology, accepted plaintiff as their patient and agreed to care for her through her pregnancy. On the evening of 3 June 1974 her membrane ruptured. On the following day she reported this to defendant McAllister by telephone. On 5 June she was examined by defendant Westfall. At that time she was not in pain and he sent her home. On 6 June she started having labor pains. She also experienced a discharge of meconium, which could not have occurred unless her membrane had first been ruptured. On 7 June she reported this to defendants' nurse and was examined by Dr. McAllister. He sent her home. She continued to have labor pains until 13 June, at which time the child was stillborn. The macerated condition of the child's skin indicated it had been dead twenty-four to forty-eight hours before delivery. The fetus died of severe amnionitis which went undetected by defendants. Amnionitis also prolonged plaintiff's recovery and prolonged her pain and suffering. In the opin-

ion of plaintiff's expert witness, the course of conduct pursued by defendant doctors did not conform with approved medical practices and treatment by physicians specializing in the field of obstetrics and gynecology in Lumberton, N.C.

The difficulty with plaintiff's theory is that, even if it be granted that the evidence would support a finding of the foregoing facts, still there is no evidence that anything which defendants did or failed to do in the course of their care of the plaintiff either caused or could have prevented the amnionitis, which plaintiff contends caused the death of her child and her own prolonged suffering. Her expert witness testified that in his opinion the course of treatment outlined in long hypothetical questions "did not conform with approved medical practices and treatment of a physician specializing in the field of Obstetrics and Gynecology," but he never testified what in his opinion "approved medical practices" would have been in this case. He never testified as to precisely what the defendants did that in his opinion they should not have done or as to what they did not do that in his opinion they should have done. More importantly, he never testified that had what he considered to be "approved medical practices" been followed by the defendants in their treatment of the plaintiff in this case, her child would not have been stillborn and her own recovery would not have been prolonged by amnionitis. In short while the evidence may have been sufficient to support a jury finding that defendants were negligent in failing to furnish plaintiff with the standard of care which it was their duty to provide, there was no evidence to show that any failure on the part of defendants to furnish the requisite degree of care was the proximate cause of any of the plaintiff's injuries. "To establish liability upon the surgeon or physician in malpractice cases, there must be proof of actionable negligence by the defendant, which was the proximate cause of the plaintiff's injury or worsened condition." *Starnes v. Taylor*, 272 N.C. 386, 391, 158 S.E. 2d 339, 343 (1968). The evidence in the present case, even when considered in the light most favorable to the plaintiff and even when the plaintiff is given the benefit of every ligitimate inference to be drawn in her favor, simply fails to show that anything defendants did or failed to do caused her injuries. The trial court erred in denying defendants' motion for directed verdict made at the close of all the evidence.

[3]   Defendants in this case made a timely motion for judgment notwithstanding the verdict in accordance with G.S. 1A-1, Rule 50(b)(1), which motion the trial court also denied. Since this motion was duly made, this court, having found that the trial judge should have granted the motion for directed verdict made at the close of all the evidence, could direct entry of judgment in accordance with the motion. G.S. 1A-1, Rule 50(b)(2). We are not, however, required to do so. G.S. 1A-1, Rule 50(d) provides:

> (d) *Motion for judgment notwithstanding the verdict—denial of motion.* If the motion for judgment notwithstanding the verdict is denied, the party who prevailed on that motion may, as appellee, assert grounds entitling him to a new trial in the event the appellate division concludes that the trial court erred in denying the motion for judgment notwithstanding the verdict. If the appellate division reverses the judgment, nothing in this rule precludes it from determining that the appellee is entitled to a new trial, or from directing the trial court to determine whether a new trial shall be granted.

Speaking of Federal Rule 50(d), which is in all material respects identical with G.S. 1A-1, Rule 50(d), the United States Supreme Court pointed out that even "[i]f appellee presents no new trial issues in his brief or in a petition for rehearing, the court of appeals may, in any event, order a new trial on its own motion or refer the matter to the district court, based on factors encountered in its own review of the case." *Neely v. Eby Construction Co.*, 386 U.S. 317, 329, 18 L.Ed. 2d 75, 84-5, 87 S.Ct. 1072, 1080 (1967).

Under all of the circumstances of this case, it is our opinion, and we so decide, that instead of directing entry of judgment directing verdict for defendants, the plaintiff appellee should be granted a new trial.

[4]   Since we have decided there must be a new trial and since it is probable that opinions of expert witnesses in response to hypothetical questions will again be offered, we deem it appropriate to discuss some of defendants' assignments of error directed to the trial judge's actions in overruling their objections to hypothetical questions which plaintiff's counsel asked of Dr. May, plaintiff's expert witness. Certain of defendants' objections

to the form of these questions are well taken. The questions were unduly long and prolix. They contained reference to matters which were irrelevant to the purposes for which the questions were asked. In some instances they failed to include reference to matters which were highly relevant. One illustration will suffice. To show that the stillborn child might have died as a result of amnionitis, plaintiff's counsel asked Dr. May the following question:

Q. Doctor May, I ask you, assuming that if the jury should find from the evidence in this case and by its greater weight thereof that Barbara Lindsey, in her last month of pregnancy, having been checked on May the 29th, 1974, by Doctor Westfall, and having been informed by him at that time that she had opened up slightly and that her child could be born at any time thereafter and that Barbara Lindsey, approximately five days thereafter, on June the 3rd, 1974, experienced a discharge of fluid from her vagina which ran down and soaked both legs of her slacks and that same night approximately one hour thereafter, she experienced another discharge from her vagina which she described as "a gush of fluid containing approximately three to four quarts of fluid" which soaked two bath towels, which she had positioned between her legs, and that Barbara Lindsey, early the following morning on June the 4th, 1974, called and spoke with Doctor McAllister and informed him that in her words "her water had broken" and that Doctor McAllister asked her when was her regularly scheduled appointment and informing him that it was the following morning, he asked her to wait and come in at that time at her regularly scheduled appointment on June 5th, 1974, and that Doctor McAllister did not mention to Barbara Lindsey to take her own temperature, nor did Barbara Lindsey take her own temperature; that Barbara Lindsey, on June 5th, 1974, was seen by Doctor Westfall for an examination of from two to four minutes and that neither Doctor Westfall nor his nurses took Mrs. Lindsey's temperature, nor did Doctor Westfall or any of his nurses ask Mrs. Lindsey to check her own temperature, nor did Barbara Lindsey take her own temperature, nor did Doctor Westfall prescribe any medication for Mrs. Lindsey, nor did the records of the clinic introduced into evidence indicate that any test was given by Doctor Westfall, Doctor McAllister or

anyone in the clinic to determine if the membranes had rup-
tured nor do the records indicate that her temperature was
taken; that Mrs. Lindsey, having had no problem with swell-
ing and having lost by her doctor's records five pounds since
May the 29th, 1974, and that Doctor Westfall sent her home
to return on Friday, the 7th of June, 1974;

That on June the 6th, 1974, Barbara Lindsey began hav-
ing a bloody discharge, red in nature, and on the day of June
6, 1974, Mrs. Lindsey began having sharp pains at regular in-
tervals approximately twenty minutes apart and that on the
morning of June 7, 1974, Mrs. Lindsey began having a
discharge from her vagina which was green and black in col-
or and which she described as "thick in nature so that it re-
mained above the water level in her commode for her to
plainly see" prior to flushing that commode and that Barbara
Lindsey went to see Doctor McAllister a few hours later on
the morning of June 7, 1974, and described to Doctor
McAllister and his nurses both the bloody discharge and the
green and black discharge as well as the sharp pains at
regular intervals which she was having approximately twen-
ty minutes apart and that neither Doctor McAllister nor any
of his nurses took the temperature of Mrs. Lindsey on June
7, 1974, nor did Doctor McAllister nor any of his nurses tell
Mrs. Lindsey to check her own temperature, nor did Barbara
Lindsey check her own temperature and that Mrs. Lindsey,
according to her doctor's records had lost eight and one-half
pounds at this time, since May 29, 1974, and that Doctor
McAllister examined Mrs. Lindsey for approximately two to
four minutes and Doctor McAllister noted on his notes on
that day of June 7, 1974, "contractions began yesterday; some
bloody show; no dilation," and that Doctor McAllister did not
prescribe any medication for Mrs. Lindsey nor did the
records of the clinic introduced into evidence indicate that
any test was given by Doctor Westfall, Doctor McAllister or
anyone in the clinic to determine if the membranes had rup-
tured, nor do the records indicate that her temperature
was taken, and that he stated to Mrs. Lindsey, "I could not
feel the baby and it is so high up at this time that if I were
to induce labor your baby would die," and that Doctor
McAllister told Mrs. Lindsey to come back in one week on

the following Friday and that Mrs. Lindsey had not felt her baby move since June 5th, 1974;

That on June 8th, 1974, Mrs. Lindsey continued to have sharp pains although at irregular intervals and that her discharge of black and green substance continued as well as did her discharge of bloody substance and that her pain on June 9th and June 10th continued to be severe and on June 11th, Barbara Lindsey called her Obstetricians and Gynecologist, Doctor McAllister and Doctor Westfall, three separate and distinct times and none of her calls were returned and that she could not contact either Doctor McAllister or Doctor Westfall by phone and she did not receive any calls from Doctor Westfall or Doctor McAllister on or after June 11th, 1974, and that Barbara Lindsey had stayed off her feet unable to perform her normal daily activities and that on June 12th, 1974, early on that afternoon, Mrs. Lindsey of her own free will went to the offices of Doctor McAllister and Doctor Westfall.

Do you have an opinion satisfactory to yourself and to a reasonable medical certainty as to whether or not Angela Lindsey, the deceased fetus in this instance, could or might have died as the result of amnionitis?

Defendants' objection to the question was overruled. To this question, the witness replied that in his opinion "the infant might have died from infection." Defendants' motion to strike was denied.

The question was undoubtedly an effective summation before the jury by plaintiff's counsel of his view of his client's case, but that in itself was not a legitimate purpose to be served in asking a hypothetical question. In addition, it contains reference to so many irrelevant matters that defendant's objection should have been sustained on that ground alone. *See Ingram v. McCuiston,* 261 N.C. 392, 134 S.E. 2d 705 (1964). For example, defendants' failure to return plaintiff's telephone calls, which was also referred to in two other long hypothetical questions, might have been relevant to show a lack of concern for the plaintiff on the part of the defendants, but it could hardly have been relevant to determine whether the deceased fetus "could or might have died of amnionitis." On the other hand the question fails to include reference

to many obviously relevant facts shown by uncontradicted evidence in this case. For example, the question does not state as assumed facts that the child was stillborn, that it was delivered by a breech extraction, that the umbilical cord was wrapped tightly around its leg, that amnionitis was observed by the delivering doctor at the time of the delivery, or that plaintiff ever had amnionitis. With all deference to the impressive credentials of plaintiff's expert witness, it is difficult for this court to understand how, solely on the basis of the facts assumed in the above quoted hypothetical question, Dr. May could express the opinion "to a reasonable degree of medical certainty" that "the infant might have died from infection." It seems probable that he based his opinion, at least in part, by assuming the existence of facts not stated in the question.

It was error for the trial court not to sustain defendants' timely objection to the question and error to deny defendants' motion to strike the answer.

For the reasons stated, this case is remanded for a

New trial.

Judges CLARK and ERWIN concur.