The defendant was indicted under a bill of indictment charging him with murder in the first degree. "On the 31st day of August, in the year of our Lord one thousand nine hundred and thirty-eight, with force and arms, at and in the County aforesaid, unlawfully, willfully, feloniously, premeditatedly, deliberately and of his malice aforethought did kill and murder one W. H. Williamson, against the form of the statute in such case made and provided and against the peace and dignity of the State." N.C. Code, 1935 (Michie), secs. 4200 and 4614. The verdict of the jury was, "Upon their oath, say that the said Clarence Bracy, alias David Jiggetts, is guilty of the felony and murder as charged in the bill of indictment, in the first degree." The court below rendered judgment on the verdict: "Death by the administration of lethal gas." From the judgment pronounced of murder in the first degree, the defendant appealed to the Supreme Court.
The facts were to the effect: The deceased, W. H. Williamson, was curing tobacco at his barn. He had some small amount of money ($9.80) in a little tobacco sack. He went to the barn a little after 10:00 o'clock on the night of 31 August, 1938. Next morning about 6:00 o'clock a hand working on the place, Tobe Henderson, notified Williamson's daughter, Lillie Williamson. She testified, in part: "We found my father lying on the ground; he had been struck and there was a knot not quite as large as a hen egg on the right side of his head. As to the other cuts I do not remember. He was unconscious and as to whether he regained consciousness before he died I do not know. My brother Ollie, Charlie Howell, Uncle John Burwell and Cleve Stegall picked my father up and carried him to the hospital. He was very near the front of the door but a couple of feet from the barn on the ground. He had some guano bags folded under his head for a pillow; they were on the ground and his head lying on them. There was one tobacco truck near. The little tobacco sack that he carried his money in was on the bench where he slept, about six feet from where my father was lying. The bench was made of some long planks and his feet kinda under the end of the bench. It was about 6:00 o'clock on Thursday morning when we found him. Clarence Bracy, alias David Jiggetts, had been working for my father from Monday afternoon of one week until Wednesday night of the next week, the night my father was struck. . . . I had opportunity to observe Clarence Bracy, alias
David Jiggetts, when I fed him at the table and while he was working on the farm. I would say he had the mental capacity of the average colored man. He acted like other colored people. He was polite and mannerable in every way. Of course I did not ever talk to him more than was *Page 250 
necessary with any colored people that worked there. Tobe Henderson has worked at home off and on, not regularly, for the last ten years. His general reputation in the community where he lives is good."
O. G. Williamson testified, in part: "I am the son of W. H. Williamson. I am married and live about a half mile from my father's home. . . . I know that my father carried his money in a little sack with some red letters on it; I gave it to him. The sack which you have handed me is the one he carried. I did not know my father had been stricken until Tobe Henderson came down to let me know around 6:00 o'clock Thursday morning. I then got in my automobile and went up to the barn where he was and brought him to the hospital. I did not particularly notice the ground around him for I was after getting him up as quickly as I could and getting him to the hospital. He was unconscious at the time and never regained consciousness. I was present while the doctors were examining him until they prepared his head for the operation. He was injured over the right ear; his skull seemed to be crushed for 3 1/2 or 4 inches on the right side, and when Dr. Bass was ready to sew it up he ran his fingers down to find out whether his skull was crushed and I was standing there looking. They then told me I could not stay any longer. I did not know Clarence Bracy, alias David Jiggetts, before this happened but I had seen him working for my father. I had been in fifteen yards of him but had not spoken to him. He started working there on Monday of one week and worked until Wednesday of the next week, the Wednesday that my father was stricken that night. I next saw Bracy in Raleigh on Tuesday, two weeks ago, when I talked with him some. He said he knew me and I asked him what he did with the pocketbook the old fellow had, and he said he did not have a pocketbook, that he had a little tobacco sack. I asked him what he did with it and he said he left it by the tobacco bench. I asked him did he know who I was and he said he did, and told me I rode a horse up to to my father's one day and he recognized me. I went back and found the tobacco bag where he said it was. Clarence Bracy claimed he had all the money he got out of the sack that he took from my father; said he got the amount of money out of the bag that the officers got off of him. He said that he, himself, hit my father with a wagon standard while he was lying on the bench asleep; said he hit him to get the money. Mr. H. M. Lewis, Mr. J. W. Keeter, Charlie Howell and Thomas L. Williamson were present when this conversation took place."
J. W. Keeter testified, in part: "I live near Townsville, about 3 or 3 1/2 miles from the late W. H. Williamson. I have known Clarence Bracy,alias David Jiggetts, since 1927. He worked for me in the years 1927 and 1928. I went to Raleigh with Mr. Lewis and some of the boys and talked to him in the Raleigh jail, in the office. The jailer brought *Page 251 
him in the office and that is where I had the conversation with him. . . . I did not make any suggestion of any benefit that would accrue by way of making the statement. Mr. Lewis, the jailer, and his wife, the two Williamson boys and Charlie Howell were present when the conversation took place. Continuing the conversation, I said to him, `Who was with you the night you murdered Mr. Williamson?' He said, `Nobody.' I said, `Davy, who was the man on the road in the automobile waiting to take you away; did he help you?' He said, `No, sir.' I said, `Did not Robert Henderson help you?' He said, `He was not there.' I said, `Where was he?' He said, `I did not see him after he ate supper.' I asked when he saw Robert and he said he did not see him any more until after he come to Raleigh. I said, `Davy, I can hardly believe you murdered Mr. Williamson alone, I think you had some help.' He said, `No, sir, I did it myself.' I then said, `What tool did you use to murder him with, I understand there was an axe close by the wagon standard.' He said, `I used the wagon standard.' I said, `Go ahead and tell how it happened.' He said, `I laid down under the shed and went to sleep and woke up, could not tell the time, and looked around and Mr. Williamson was lying out on a frame he had up on some trestle benches; Mr. Williamson was lying on that table and I got up and went out there and looked at him and he was asleep,' and he seemed to stop talking then and I said, `Go ahead and tell the truth, the whole story.' He said, `Then I went back to the shed and got a wagon standard and hit him.' I asked him if he hit him with one or both hands and he said, `I hit him with both hands.' I said, `You murdered him and robbed him,' and he said, `Yes, sir.' I said, `You did it by yourself,' and he said, `Yes, sir.' During the conversation I asked him the same question seven or eight times and when I finished up Mr. Lewis said, `That is sufficient, let us go.' I said, `Let me ask you this one question — Davy, my understanding is that you murdered Mr. Williamson and then robbed him by yourself and did not have any help, is that what you told me?' He said, `Yes, sir.' In the conversation I asked him what kind of pocketbook Mr. Williamson had the night he murdered him and he said, `He did not have any pocketbook, he had a little smoking tobacco sack with his money in it.' I said, `How much money did you get off of Mr. Williamson?' He said, `$3.20.' I said, `If you had known you were not going to get but $3.20 would you have killed him?' He said, `No, sir.' I said, `How much money did you expect to get off of Mr. Williamson?' He said, `I thought sure I would get $15.00 or $20.00.' . . . I saw him (Clarence Bracy, alias David Jiggetts) practically every day for three years. I had not seen him since 1931 until I saw him in Raleigh. From my observation of him up until the end of 1931, and from the conversation I had with him in Raleigh, I think he has the *Page 252 
mental capacity of the average colored man. I have known Tobe Henderson for six or seven years. His general reputation in the community where he lives is good." There was other evidence to the same effect.
Sheriff J. E. Hamlett testified, in part: "From my conversation with him I think he has a very low mentality and in my opinion something like a ten or twelve-year-old boy. In my opinion the defendant has sufficient mind to know right from wrong."
Mack Hargrove testified, in part: "Mr. Williamson had the habit of sleeping on a bench at the barn when curing tobacco. The wagon standard was about twelve feet from where he slept. The first time I saw the standard there was on the Monday night before Mr. Williamson was hurt. I was at home on Wednesday night. The wagon standard is made of dogwood. . . . The last time I was at the barn before Mr. Williamson was struck was about day on Wednesday morning and a wagon standard like the one here was there at that time."
Charlie Howell testified, in part: "Mr. W. H. Williamson was my father-in-law. I went to the tobacco barn about 6:00 o'clock on the morning after Mr. Williamson was struck. The wagon standard was lying as close to Mr. Williamson as that table — about five feet. Mr. Cottrell picked up the wagon standard and examined it and someone brought it to Henderson to see if they could get some fingerprints. . . . I examined the wagon standard very closely that morning and I know the one here is the same one that was there that morning."
W. B. White testified, in part: "I have known Clarence Bracy or David Jiggetts some ten or twelve years and have seen him constantly during that time, some two or three times a week. He is twenty-three or twenty-four years old. I have had opportunity to observe him during these years and in my opinion he has the mental capacity of the average colored boy. He would trade at my store sometimes once a week on Saturday and sometimes during the week. He would pay for what he got and knew change when I gave it to him."
Dr. H. H. Bass (admitted to be a medical expert) testified, in part: "He was struck on the right side of his head and had a laceration on his head about four inches long, a straight but downward laceration. The skull was crushed in and had a laceration over his right eye about one inch long and took about two stitches to close that. I called Dr. Royster to see him and we took out a piece of bone about 2 inches by 4 inches in size. The skull was crushed and in very bad shape. I have an opinion satisfactory to myself that Mr. Williamson's death was caused by a blow by some dull instrument." The State offered in evidence a dogwood wagon standard.
Joseph Jiggetts, a witness for the defendant, testified in part: "I am the uncle of Clarence Bracy, alias David Jiggetts. His mother is in *Page 253 
Durham and she turned him over to me fourteen years ago. His mother was never married. He has been with me since that time. He has always been an easy boy and did not have much to say. I sent him to school and he would stop on the side of the road and eat up his dinner, and come back home and tell me he had been to school but he had not been. He never went to school but mighty little. He cannot read or write. When I corrected him he would go ahead and do what I asked him to do for a short while, and it seemed like he would get angry or some way, and do something contrary to what I told him to do. I could come home and bring anything from the store and put it down. He would go and move it. I would ask where it is and he would say he did not know. The only way I would find it would be crossing it some way; he would not tell me. He did not do any talking at home. He would not play with other children and did not act at home as do other children. He would act fine until I stormed at him, or say anything to him about some of his misdemeanors, then perhaps for one or two hours he would do much better. For years he had been hired out to other people and I collected his wages, because he could not count any great amount of money. I would do all of his buying that was over $10.00 or $15.00, such as buying him clothes. There was a charge brought against him in Warren County this year about some clothes. I sold his tobacco and gave him $40.00 of his tobacco money. He gave me back $20.00 of the money and told me to keep it for him. . . . When my wife and I left home we would leave David at home. He would say he did not want to go with us and would stay there and take care of the children while we were gone. He did not want to go with us to the church. As to whether he would go with girls — he would leave home but where he goes I really did not know; he did not talk much and did not tell me anything. Boys and girls in the neighborhood would come to the house but he would not have much to say to them. Whatever little talking he would do if there was any pranking with him he would cuss them out. . . . I have not been in any trouble except the trouble I got in by this boy bringing the stolen goods to my house. Sheriff Pinnell carried me to jail about it; said the stolen property was under the roof of my house. I did not know it was stolen at the time. Just as soon as David Jiggetts stole the stuff and carried it to my house he went out of the packhouse and did not come back before the next day and that is when they caught him. As soon as he got out of trouble in the recorder's court of Warren County he left and I did not see him any more."
The defendant testified, in part: "I was not mad with Mr. Williamson; he had not done anything to me. When the men took me in the car at Norlina and drove down the road and stopped they asked me was I the man named Clarence Bracy, and I told him `Yes, sir.' Then they *Page 254 
asked me where did Mr. Hicks live and I told him in front of the lumber yard. They stopped before they got to the place and the one that was under the steering wheel turned around and told me, `I want you to tell me the truth now about the thing, did not you hit Mr. Williamson with an axe?' and I told him, `No, sir, I did not hit him with an axe. I hit him with the wagon standard.' . . . When Mr. Keeter came to see me in Raleigh he told me he was looking for me to tell him the truth about it and he would do all he could to help me. He said I knowed he had been helping me and I said `Yes, sir,' and he said he was looking for me to tell him the truth about it. He did not say he would clear me if I would tell him the truth, he said he would do what he could for me. . . . When I hit Mr. Williamson I did not know what would be done to me about it if they caught me. The first time I knew they would do something to me for it was when I was in Raleigh. . . . I have known Mr. Keeter a long time. When I saw him in Raleigh and he told me to tell him the truth about how it happened, that is when I told him; everything I told him was the truth about how it happened. I changed my name from David Jiggetts to Clarence Bracy so I could get a job and get the money for my work. My uncle had been getting all of my money when I worked out anywhere and that is why I changed my name. I don't know how long the wagon standard had been setting there beside the barn. I don't know how long Mr. Williamson had been asleep when I hit him; I reckon he was asleep, he was laying down. I don't know where he had his hand; he did not have it under his head. I hit him over his head. He had the tobacco sack in his front pocket. I took it out and found he had three pieces of money and some silver. I did not have any money in my pocket before I hit Mr. Williamson. He did not do anything when I hit him; did not try to get up. He just turned over but did not fall off the plank he was on; he did not move. After I got the money out of the sack I left it lying there on the planks. I told Mr. Ollie Williamson where I had thrown the tobacco sack after I got the money out of it. Just as soon as I had done that and gotten his money I ran away. . . . I don't know what time of night it was that I hit Mr. Williamson; it was dark; I had not been to sleep. I do not know how long Mr. Williamson had been to sleep before I hit him. He was out the whole time I was out there and I do not remember him going to the house. . . . No member of Mr. Williamson's family had done anything to make me mad. The reason I hit him was to get the money and I was not mad at him or none of his folks. They had treated me all right. I had not asked him for money and did not know when I was to get my money. I did not want to kill him and did not thought I had hurt him." *Page 255 
R. J. Rivers testified for defendant, in part: "I live in Warren County. I have known David Jiggetts for the past two years. He worked for me off and on at different times. I think he is lacking something mentally. I could not say definitely that he knows right and wrong all the time but I judge from his general appearance and acts day by day that he is not totally developed in knowledge and brains. He worked for me at different times as day laborer on my farm. He was as good a hand as I have ever worked. Just tell him what to do and he will do the work. His uncle got the money for the work he did for me. He worked for me setting out tobacco in May of this year; he used a peg setter. He worked for me last year some too. I have known him for two years and know he will do what I tell him to do. I could not say whether he knows right from wrong all the time, but I do know he has sense enough to do what you tell him to do. He is very polite, comes to work on time. He got his meals at his home. I lived 200 or 300 yards from him."
P. E. Hilliard testified for defendant: "I have known David Jiggetts for two years. I have worked him some and he worked on the farm of his uncle. His uncle collected his wages when he worked for me. The uncle never told me how old he was. I did not see anything in his mental capacity when he worked for me to indicate he did not know right from wrong."
The question involved: First. Did the court err in instructing the jury, with respect to the insanity, or mental disease, or low order of intelligence to the extent that one is not responsible for his acts offered by the defendant as a defense in charging the jury? We think not. We think the charge correct.
The following is the complete charge on this aspect: "When insanity, or mental disease, or a low order of intelligence to the extent that one is not responsible for his acts is interposed as a defense in a criminal prosecution, the burden rests with the defendant who sets it up to prove such insanity or mental disease, or low order of intelligence, not beyond a reasonable doubt nor by the greater weight of the evidence, but merely to the satisfaction of the jury. Since a criminal intent is an essential element of murder, if by reason of insanity, or mental disease, or a low degree of intelligence, a person is incapable of forming any intent, he cannot be regarded by the law as guilty. The mental derangement must be such as to render the one afflicted therewith incapable of forming a *Page 256 
criminal intent. Every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proven to the satisfaction of the jury, not beyond a reasonable doubt nor by the greater weight of the evidence but merely to the satisfaction of the jury. To establish a defense on the ground of insanity, or mental disease, or a low degree of intelligence, it must be shown merely to the satisfaction of the jury from the evidence that at the time of committing the act the party accused was laboring under such a defect of reason, whether it is insanity, whether it is mental disease, or whether it is a low degree of intelligence, as not to know the nature and quality of the act he was doing, or, if he did know, that he did not know that he was doing wrong. The capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission is made the test of his responsibility. . . . But the defendant's defense is not complete and he is not entitled to acquittal on the ground of insanity, or of mental disease, or a low degree of intelligence if at the time of the commission of the crime he had sufficient capacity to enable him to distinguish between right and wrong, to understand the nature and consequences of his act, and had mental power sufficient to apply that knowledge to his own case. Whatever may be his mental weakness, if a person has knowledge and consciousness that the act he is doing is wrong and will deserve punishment whatever may be his mental weakness, he is in the eye of the law of sound mind and memory, and subject to punishment. If the prisoner at the time he committed the alleged homicide was in a state to comprehend his relations to other persons, the nature of the act and its criminal character, or, if he was conscious of doing wrong at the time he committed the act, he is responsible. But if, on the contrary, he was under the visitation of God either in the form of insanity, or mental disease, or a low degree of intelligence, and could not distinguish between good and evil, and did not know what he did, he is not guilty of any offense against the law, as guilt arises from the mind and wicked will. The Supreme Court of North Carolina in one of its recent decisions has said, `The insanity, or mental disease, or low degree of intelligence which would be available to a person as a defense, must be a mental disease such as renders the person incapable of knowing the nature and quality of the act he was committing. The test is, as to whether or not he was responsible, is a knowledge between right and wrong. If he knew the act he was engaged in was wrong and that it was unlawful, then in the eyes of the law he would be sane, and his plea would not avail him, but, if at the time of the act he did not know that his act was wrong, and did not know the difference between right and wrong, then in law he would not be responsible for the act that he did, but if he did know so at the *Page 257 
time of the act then his plea of insanity, or mental disease, or low degree of intelligence cannot avail him.'"
There was no exception or assignment of error to the above charge. The charge in substance is taken from S. v. Jones, 191 N.C. 753 (758-9). It is the rule laid down in S. v. Potts, 100 N.C. 457 (463-4): "That when such proof of the homicide is presented, matters in excuse or mitigation must appear, or be shown, not beyond a reasonable doubt, but to the satisfaction of the jury. The prisoner admitting the killing by means of a shot from a pistol, that instrument, thus used, is a deadly weapon, and the law implies malice, unless its absence is made to appear, and this must be to the satisfaction of the jury. The prisoner to be responsible for his act, must have legal capacity at the time to distinguish between good and evil, and to know what he was doing, to comprehend his relations towards others, the nature of his act, and a consciousness of wrong. In the inquiry as to the prisoner's mental condition he is assumed to be sane, that is, to have the degree of mind and reason required to constitute criminal responsibility for his acts, but he may prove the want of such legal capacity by evidence of the presence of insanity. . . . The measure of criminal responsibility is this: If the prisoner at the time of the homicidal act was in a state of mind to comprehend his relations to others, the nature and criminal character of the act, was conscious that he was doing wrong, he was responsible; otherwise, he was not, and such should be the verdict. . . . We think the law was fairly laid down, and as favorable to the prisoner as he could ask. Indeed, it would seem in one particular, more so. The charge appears to admit of a construction that puts upon the State the proof of sanity, when it becomes a matter of controversy, though it need not be such as to remove all reasonable doubt, but only sufficient to satisfy the minds of the jury. This burden, with this measure of proof, rests, however, upon the accused, according to the repeated adjudications of the Court. S. v. Brittain, 89 N.C. 481; S. v. Payne, 86 N.C. 609. The charge is strictly in accordance with S. v. Haywood, Phil., 376. . . . The test of accountability for crime is the ability of the accused to distinguish right from wrong, and that in doing a criminal act he is doing wrong. This is settled in S. v. Haywood, supra."
In S. v. Jenkins, 208 N.C. 740 (741), speaking to the subject, it is said: "`Low mentality is not the test of insanity.' S. v. Spivey,132 N.C. 989, 43 S.E. 475. He who knows the right and still the wrong pursues is amenable to the criminal law. S. v. Potts, 100 N.C. 457,6 S.E. 657. We are aware of the criticism of this standard by some psychiatrists and others. Nevertheless, the critics have offered nothing better. It has the merit of being well established, practical, and so plain `that he may run that readeth it.' Hab. 2:2." S. v. Edwards,211 N.C. 555 *Page 258 
(557); S. v. Alston, 214 N.C. 93 (94); S. v. Hawkins, 214 N.C. 326.
In S. v. Falkner, 182 N.C. 793 (797), it is written: "In Shepard v.Tel. Co., 143 N.C. 244, the present Chief Justice (Clark), speaking for a unanimous Court, states the rule as follows: `In criminal cases, when a homicide with a deadly weapon is proved or admitted, there is a presumption of law that the killing is murder, and the burden is on the prisoner to prove all matters in mitigation or excuse to the satisfaction of the jury.S. v. Matthews, 142 N.C. 621; and when a totally independent defense is set up, as insanity, which is really another issue, S. v. Haywood,94 N.C. 847, the burden of that issue is on the prisoner." S. v. Nall,211 N.C. 61.
Second. Is a defendant charged with a capital felony, whose defense is the lack of mental capacity to commit the crime of murder in the first degree, entitled to have the jury know the provisions of law contained in C. S., secs. 6237 and 6239, which provide for his detention in a State Hospital, and that his discharge therefrom can only be procured in the manner therein provided? We think not.
N.C. Code, supra, sec. 6237, relates to "persons acquitted of certain crimes or incapable of being tried, on account of insanity committed to hospitals." Sec. 6239 — "Persons acquitted of crime on account of insanity how discharged from hospital."
The statement of case on appeal shows that the defendant's counsel argued to the jury that the defendant should be acquitted on the ground of insanity, and that, if he was acquitted on that ground, he would not go free, but would be put in the criminal insane department of the State Prison, and he read and explained to the jury sections 6237 and 6239,supra, of the Consolidated Statutes. No objection was made to this argument by the solicitor. The solicitor argued to the jury that the defendant would go free if the jury returned a verdict of not guilty on the ground of insanity. No objection was made to this argument by the defendant. The defendant's counsel requested the court to instruct the jury in accordance with his argument to them, but the court declined to give this instruction.
In S. v. Walls, 211 N.C. 487 (496), it is said: "Did the court err in refusing to tell the jury of the punishment attempt to commit second degree burglary would carry? We think not. In S. v. Matthews, 191 N.C. 378
(381), this Court has decided contrary to defendant's contentions: `The jury has fully discharged its duty, and performed its functions, under the law of this State, when its members have sat together, heard the evidence, and rendered their verdict accordingly. As the judge must not invade the true office and province of the jury by giving an opinion in his charge, either in a civil or criminal action, as *Page 259 
to whether a fact is fully or sufficiently proven (C. S., 564), so the jury must be content to leave with the judge the grave responsibility imposed upon him to render a judgment, upon their verdict, according to law.'"
All the evidence was to the effect that the defendant was guilty of murder in the first degree. The killing was willful, deliberate and premeditated for the purpose of robbing the deceased. This was so found by the jury beyond a reasonable doubt. The question of insanity, the defense of defendant, was submitted to the jury upon a charge by the court below free from error.
The defendant was given a fair and impartial trial. In law we find
No error.