STATE OF NORTH CAROLINA v. GREGORY JAMES TAYLOR

No. 48

(Filed 17 June 1976)

1. **Criminal Law § 29— mental capacity to stand trial — sufficiency of evidence to support determination**

The evidence was sufficient to support the trial court's determination that defendant had the mental capacity to stand trial for first degree murder where a psychiatrist testified for the State that in his opinion defendant would be able to assist counsel in the preparation of his defense, the other expert witnesses did not contradict this opinion, and defendant testified that he was aware of the nature of the charges against him and could talk to his counsel from day to day so that counsel could understand the happenings on the day of the crime. G.S. 15A-1001 *et seq.*

2. **Criminal Law § 50— presentation of expert testimony**

Expert testimony may be presented to the jury through the testimony of an expert based on his own personal knowledge and observation or through testimony of an expert based on a hypothetical question addressed to him in which the pertinent facts are assumed to be true.

3. **Criminal Law § 52— hypothetical questions**

A hypothetical question should include only facts supported by the evidence already introduced or those facts which a jury might logically infer therefrom, and the question should not contain repetitious, slanted or argumentative words or phrases.

4. **Criminal Law § 52— hypothetical question — assumption inferred from evidence — non-vital assumption not supported by evidence**

In a hypothetical question asked a psychiatrist as to defendant's ability to distinguish between right and wrong at the time of a murder committed during a robbery, the assumption that defendant concealed a weapon under a coat worn by him for that purpose could be inferred from the evidence, and the erroneous assumption that defendant provided a wig to conceal the identity of an accomplice was not of such vital nature as to require a new trial.

5. **Criminal Law § 52— expert testimony — hypothetical questions**

A hypothetical question which omits any reference to a fact which goes to the essence of the case and therefore presents a state of facts so incomplete that an opinion based on it would be obviously unreliable is improper and the expert's answer to such a question will be excluded; however, it is not necessary to include in the hypothetical question all the evidence bearing upon the fact to be proved, since the adversary has the right to present other phases of the evidence in counter-hypothetical questions so as to supply omitted facts and to ask the expert on cross-examination if his opinion would have been modified by the inclusion of such omitted facts.

6. **Criminal Law §§ 52, 63— ability to distinguish right from wrong — hypothetical question — no reference to history of mental illness**

The omission of any reference to defendant's history of mental illness and prior judicial commitments in a hypothetical question asked a psychiatrist as to defendant's ability to distinguish right from wrong at the time of the crime did not constitute reversible error.

7. **Criminal Law § 75— in-custody statements — mental capacity**

The record as a whole in this murder prosecution, including testimony by an officer and by two psychiatrists, showed that defendant possessed sufficient mental capacity to make in-custody statements voluntarily and understandingly and supported the trial court's determination that defendant did voluntarily and understandingly make such statements.

8. **Criminal Law § 63— accused's mental condition — non-expert testimony**

A non-expert witness may testify as to his opinion of an accused's mental condition when the witness has had reasonable opportunity to observe the person and to form an opinion based on such observations.

9. **Criminal Law § 93— admission of in-custody statements in rebuttal**

The trial judge did not err in admitting defendant's in-custody statements as a part of the State's rebuttal evidence.

10. **Criminal Law §§ 5, 112; Homicide § 28— insanity — instructions on burden of proof**

In a prosecution for first degree murder, the trial court's instruction placing on defendant the burden of proving to the jury's satisfaction that he was legally insane at the time the crime was

committed, and the court's failure to instruct that the State had the burden of proving defendant's sanity beyond a reasonable doubt, did not contravene the decision of *Mullaney v. Wilbur*, 421 U.S. 684.

**11. Criminal Law §§ 5, 111— defense of insanity — instructions on commitment procedures for criminally insane**

Where defendant interposed a defense of insanity to a charge of first degree murder, the trial court erred in the denial of defendant's request for an instruction setting out the commitment procedures outlined in G.S. 122-84.1, applicable to acquittal by reason of mental illness.

APPEAL by defendant from *Kirby, J.,* 15 September 1975 Schedule A Criminal Session of MECKLENBURG Superior Court.

Defendant was indicted and tried upon a bill of indictment charging that ". . . Gregory James Taylor . . . on the 24th day of January, 1975, with force and arms . . . feloniously, willfully, and of his malice aforethought, did kill and murder Betty Flood Moore."

Defendant was arrested upon a warrant charging him with the murder of Mrs. Moore. Upon motion of defendant's court-appointed attorney filed 25 January 1975 and pursuant to G.S. 122-91, defendant was committed to Dorothea Dix Hospital on 27 February 1975 for a period not to exceed sixty days for observation to determine if he was mentally competent to stand trial. By letter dated 14 March 1975, Dr. James Groce, staff psychiatrist at Dorothea Dix Hospital, advised the Clerk of Superior Court of Mecklenburg County that "In our opinion Gregory Taylor is able to conduct his defense to the end that any available defense may be presented." Defendant was thereupon returned to Mecklenburg County and the Grand Jury returned a true bill couched in the language of G.S. 15-144. On 2 September 1975, a pretrial hearing was conducted pursuant to the provisions of G.S. 122-83 and G.S. 122-84. After hearing medical testimony including testimony of four psychiatrists, Judge Snepp found facts and concluded as a matter of law that defendant had capacity to proceed within the meaning of North Carolina General Statutes 15A-1001 *et seq.* The judge ordered that the Sheriff of Mecklenburg County take care that medications prescribed for defendant would be administered as directed.

Upon being arraigned defendant, through his court-appointed attorney, entered pleas of not guilty and not guilty by reason of insanity.

The State's evidence tended to show that at about noon on 24 January 1975, Mart Moore was in the back of his grocery store, the Homestead Grocery, located on Rozzelles Ferry Road in Mecklenburg County when he heard his wife, Betty Flood Moore, call his name. He came to the front of the store and observed two black men beside the cash register. Defendant pointed a shotgun toward him and said, "Don't do anything foolish." Mr. Moore asked what he wanted and defendant, without provocation, shot and fatally wounded Betty Flood Moore. The two men then ran from the store. Mr. Moore, who had previously seen defendant in his place of business, testified that defendant wore a white turtleneck shirt and his companion wore a burgundy shirt, sunglasses and a wig. At trial, Mr. Moore positively identified defendant as the man who shot and fatally wounded his wife.

Barry Gulley testified that he saw two black males run from the Homestead Grocery store on 24 January 1975. One of the men, wearing a white sweater, ran into the grounds of the Leaksville Mill. The other man, wearing a burgundy sweater and sunglasses, ran into a parking lot behind the mill. He saw them drop something in a ditch which he later found to be a shotgun and a wig. James McKinney Campbell saw defendant at the Leaksville Mill around noon and defendant asked him how to get through the mill.

Dennis Weathers testified that on 24 January 1975 he saw defendant, who at that time asked him to take him to "the mill on Rozzelles Ferry Road to pick up some money." Defendant was dressed in a trench coat with a sweater under it. He later picked up Larry Davis who was wearing a burgundy or red sweater. They then proceeded to the mill where both Taylor and Davis left the car. Taylor ran back to the car about fifteen minutes later. He was not wearing the trench coat and was pulling off the sweater as he ran. He threw the sweater on the ground, entered the car and said he had "to get away from here." As they drove toward town, Taylor said that he and Davis had gone into the store to take some money. He asked the lady for money and she refused. He turned to leave, but when she reached under the counter, he shot her with a shotgun.

The State also introduced into evidence Exhibits 11 and 12—two written statements which were signed by the defendant and defendant's sister, Thelma Moore.

We will more fully consider the statements introduced into evidence and the proceedings concerning defendant's ability to stand trial in the opinion.

The defendant offered evidence which was mainly directed to his lack of mental capacity. Defendant's mother, Eunice Taylor, stated that her son was twenty-one years old and that he had returned from New York about two years ago. Before going to New York, he was a normal boy but on his return, he did very strange things such as making motions as if he was playing a guitar when he did not have a guitar. He had a strange look in his eyes and he thought that she was against him. He told the witness's grandson that he thought his mother was a monster. His actions caused her to become afraid of him. He was hospitalized in Charlotte Memorial Hospital because of his condition for a period of about one month and he was later committed to Broughton Hospital where he remained for a short time. He was given medication which seemed to help him. She stated that in her opinion defendant did not know the difference between right and wrong on 24 January 1975.

Defendant's father, Willie James Taylor, also testified as to defendant's mental condition. He stated that his son said that he heard voices and that he was in a war with his father and family and that his mother was an enemy. He saw defendant on 25 January 1975 and in his opinion defendant did not know what he was doing.

Defendant's sister, Thelma Moore, related instances of defendant's strange behavior similar to those related in the testimony of her parents. She also testified that she accompanied defendant to the Law Enforcement Center on 25 January 1975 where he made two statements to police officers in her presence. She stated that she saw defendant sign these statements after they were reduced to writing and that she also signed each of the statements.

Mrs. Lynn Asprogiannis, the Chief Head Nurse at the Mecklenburg County Jail, testified that she first observed defendant when he was in custody in 1973. At that time, she administered the prescribed drugs, Stelazine and Thorazine. He was seen again on 30 June 1975 and she again administered drugs as prescribed. He was thereafter transferred to Dorothea Dix and upon his return to the Mecklenburg County Jail, she was directed to continue giving him Thorazine and Stelazine.

State v. Taylor

She stated that he was hyperactive and talkative on the occasions she saw him.

Dr. Mildred Keene, admitted as an expert in the field of psychiatry, stated that she first examined defendant in August 1973. She testified that defendant said that he was hearing voices and he appeared to be in a psychotic condition. Defendant remained at Charlotte Memorial Hospital under her care until 28 September 1973. She diagnosed his condition as being schizophrenia, paranoid type. His mother returned him to the hospital on 9 August 1974 and at that time, he was oriented as to time, place and person but was still hallucinating. Upon Dr. Keene's recommendation, he was readmitted to the hospital where he remained until 21 August 1974. He was treated by administering the drugs of Stelazine and Thorazine. In her opinion, defendant could be lucid on one day and disoriented the next day. She recommended involuntary commitment for a long term of treatment.

Dr. William Isaac Jones, an expert in family medicine, observed defendant in Wilmith Hospital during the periods 6 September 1974 to 13 September 1974. His opinions as to defendant's condition and the treatment which he administered were compatible with Dr. Keene's testimony as to her diagnosis and treatment of defendant.

In rebuttal, the State offered the testimony of Dr. James Gregg Groce, a staff psychiatrist at Dorothea Dix Hospital, who was qualified as an expert in the field of psychiatry. He testified that defendant was in Dorothea Dix Hospital from 28 February 1975 until 20 March 1975. He interviewed defendant several times and during the same period defendant was given physical and psychological tests. Defendant's score of 78 on an IQ test was two points below the normal range. It was Dr. Groce's opinion that defendant suffered from schizophrenia, paranoid type. However, he stated that based on his examination of defendant and his knowledge of the incident for which he was in custody, it was his opinion that defendant knew what he was doing and knew the difference between right and wrong at the time the alleged crime was committed on 24 January 1975.

Defendant called Thelma Moore in surrebuttal and she testified that after some initial interrogation on 25 January

1975, a police officer made a circular motion beside his head and said, "Your brother is kind of off," and she said "Yes."

The jury returned a verdict of guilty of murder in the first degree. Defendant appealed from judgment imposing a sentence of death.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Roy A. Giles, Jr., for the State.*

*Paul L. Whitfield for the defendant appellant.*

BRANCH, Justice.

Defendant assigns as error Judge Snepp's ruling that defendant had the mental capacity to stand trial.

[1] Pursuant to motion of defense counsel, a pretrial hearing to determine defendant's competency to stand trial was conducted on 2 September 1975. At this hearing, defendant's mother, Eunice Taylor, and his father, Willie James Taylor, testified as to defendant's unusual and strange behavior for a period of about two years preceding the hearing. Their testimony at this time was consistent with their testimony offered at trial in defendant's behalf as related in our statement of facts. Both of these witnesses additionally testified that in his and her respective opinions their son did not understand the nature of these proceedings and was not able to assist counsel in presenting his defense.

Dr. Mildred Keene's testimony at this hearing was in essence consonant with her testimony at trial as summarized in our statement of facts. She did not give an opinion as to whether defendant was mentally competent to stand trial.

Dr. Robert D. Cox, an expert in the field of psychiatry, stated that he treated defendant during September 1974. In his opinion, defendant's unusual behavior "was most likely a drug-induced psychosis." He related that defendant's condition "cleared up" over a period of about three weeks when he was treated with an anti-psychotic drug called Haldon. Dr. Cox gave no opinion as to defendant's competency to stand trial.

Dr. James Gregg Groce, after testifying to facts substantially in accord with his testimony at trial as summarized in our statement of facts, stated:

. . . I believe he can assist you in that he was able to relate to me fairly fully, and at times including trivial

detail, what was going on at the time and his thinking at the time, his actions at the time, and I feel that that is the most important part of assisting you in his defense. He does have difficulty with his thinking but I don't feel that it is so severe that he would be unable to participate in the preparation of his defense.

Defendant testified that he knew that he was accused of murder and that he was going to be tried for it. He said that he was able to help his lawyer and "could talk to you [his counsel] today and tomorrow about what happened on 24 January 1975, so that you [counsel] will understand it."

Judge Snepp, after finding facts consistent with the evidence, concluded that defendant had capacity to proceed within the meaning of G.S. 15A-1001 and thereupon ordered the Sheriff of Mecklenburg County "to take especial care that the medications prescribed for the defendant are administered as directed and that the defendant actually take such medications." G.S. 15A-1003, in part, provides:

(a) If a defendant is found to be incapable of proceeding, the court must enter an order directing the initiation of proceedings for judicial hospitalization, and the court's order is a sufficient basis for the initation of those proceedings.

In *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305, Justice Lake, speaking for the Court, stated:

The test of a defendant's mental capacity to stand trial is whether he has, at the time of trial, the mental capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed. *State v. Jones,* 278 N.C. 259, 179 S.E. 2d 433; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Sullivan,* 229 N.C. 251, 49 S.E. 2d 458; Strong, N. C. Index 2d, Criminal Law, § 29; 21 AM. JUR. 2d, Criminal Law, § 65. When, as here, this question is properly raised before the defendant pleads to the indictment, it should be determined prior to the commencement of the trial, as was done in this instance. *State v. Propst, supra,* at page 69. It may be determined by the trial court with or with-

out the aid of a jury. *State v. Propst, supra,* at page 68. When the court, as here, conducts the inquiry without a jury, the court's findings of fact, if supported by evidence, are conclusive on appeal. *State v. Squires,* 265 N.C. 388, 144 S.E. 2d 49. . . .

In instant case, Dr. Groce, an expert in psychiatry, unequivocally stated that in his opinion defendant would be able to assist counsel in the preparation of his defense. Defendant testified that he was aware of the nature of the charges against him, and that he could talk to his counsel from day to day so that counsel could understand the happenings of 24 January 1975. The other expert witnesses did not contradict the crucial opinion given by Dr. Groce and, in fact, the only contradiction of Dr. Groce's expert opinion came from defendant's mother and father. We hold that the court's findings of fact were supported by the evidence and the findings in turn supported Judge Snepp's conclusions and ruling that defendant had the capacity to proceed within the meaning of G.S. 15A-1001 *et seq.*

Defendant next assigns as error the overruling of his objection to the admission of certain portions of Dr. Groce's expert opinion. He first challenges the form of the following hypothetical question:

> Dr. Groce, let me ask you a question. If the jury should find as the following facts: One, that the defendant joined with two other persons to travel to another location, that he carried a large and heavy weapon in a concealed manner, that he wore clothes especially to conceal the weapon, that he provided a wig to conceal the identity of a partner, that he attempted to commit an armed robbery, that he warned a storekeeper, "Don't do anything foolish," that he fired a single-shot weapon then fled because the storekeeper was armed, that he threw down the weapon and left the clothes used to conceal it, that he concealed himself in a nearby mill, that he asked directions calmly how to escape, that he took off identifying clothes, that he left a get-a-way car in a remote location, that he answered questions of another as to what he had done and why, and that he concealed himself until the following day, do you have an opinion satisfactory to yourself, based upon your medical knowledge and experience, as to whether or not the defendant could or might have had the capacity to

distinguish between right and wrong at the time of, and in respect to the matter under investigation?

**[2, 3]**    Expert testimony may be presented to the jury through the testimony of an expert based on his own personal knowledge and observation or through testimony of an expert based on a hypothetical question addressed to him in which the pertinent facts are assumed to be true, or rather, assumed to be found by the jury. *State v. David,* 222 N.C. 242, 22 S.E. 2d 633. However, a hypothetical question should include only facts supported by the evidence already introduced or those facts which a jury might logically infer therefrom. Questions should not contain repetitious, slanted or argumentative words or phrases. *Petree v. Duke Power Co.,* 268 N.C. 419, 150 S.E. 2d 749; *Ingram v. McCuiston,* 261 N.C. 392, 134 S.E. 2d 705; 3 Strong, North Carolina Index 2d, *Evidence* § 49 at 681.

**[4]**    Defendant first argues that the hypothetical question erroneously assumed that defendant concealed a weapon under a coat worn for that purpose and that defendant provided a wig to conceal the identity of an accomplice. The State's witness Dennis Weathers, who drove defendant to the scene of the crime, stated that defendant wore a coat over his sweater and that he did not see a shotgun. He testified that as Taylor left the car, he put his hand in his coat "as if indicating he was holding some kind of weapon." Weathers further testified that when defendant returned to the car, he said that he had shot a woman with a shotgun and "he had it under his coat all the time." This evidence would be sufficient for the jury to logically infer that defendant wore the coat for the purpose of concealing the shotgun. Admittedly there was no evidence in the record at the time the hypothetical question was asked concerning the provision of a wig to conceal the identity of an accomplice. We have held that the incorporation into a hypothetical question of an assumed finding as to a *vital fact* of which there was no evidence is ground for a new trial. *State v. Simpson,* 244 N.C. 325, 93 S.E. 2d 425. In our opinion, the erroneous assumption as to the furnishing of a wig to an accomplice by defendant in the hypothetical question was not of such vital nature as to require a new trial.

**[6]**    Defendant further attacks the form of the hypothetical question on the ground that it made no reference to defendant's extensive history of mental illness and to his prior judicial commitments.

**[5]** The general rule is that a hypothetical question which omits any reference to a fact which goes to the essence of the case and therefore presents a state of facts so incomplete that an opinion based on it would be obviously unreliable is improper and the expert's answer to such a question will be excluded. However, it is not necessary to include in the hypothetical question all the evidence bearing upon the fact to be proved. The adversary has the right to present other phases of the evidence in counter-hypothetical questions so as to supply omitted facts and to ask the expert on cross-examination if his opinion would have been modified by the inclusion of such omitted facts. *Dean v. Coach Co.*, 287 N.C. 515, 215 S.E. 2d 89; *State v. Stewart*, 156 N.C. 636, 72 S.E. 193.

**[6]** We concede that the challenged hypothetical question was not a model question, however, the deficiencies in the form of the question do not constitute reversible error.

**[7]** Defendant next assigns as error the rulings of the trial judge admitting into evidence defendant's in-custody statements.

When the State offered Officer Crowell's testimony concerning an inculpatory statement made to him by defendant, counsel for defendant objected and the trial judge then properly conducted a *voir dire* hearing in the absence of the jury to determine the admissibility of the evidence. Defendant concedes that the *voir dire* hearing was properly conducted, that the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602, and a host of our own decisions were properly given. In this connection, Officer Crowell, on his direct examination, testified that at the time he gave defendant the warnings and during the period of interrogation "He was completely rational, seemed to be. . . . [T]he defendant appeared to understand what I was talking about during the time I was talking to him. He was coherent in his answers that he gave to me when I asked him questions. The answers that he gave me were responsive to the questions that I asked him." Officer Crowell was the sole *voir dire* witness and his testimony was entirely in accord with the above-quoted direct testimony. At the conclusion of the testimony, the trial judge, *inter alia*, concluded:

> . . . [T]hat said verbal warning of his Miranda rights and his written Waiver of Right to Remain Silent and Right to Counsel During Interview were understandingly and

voluntarily given and the defendant was under no com-
pulsion to either answer in the affirmative as to his under-
standing of his constitutional rights or as to his signature
on the Waiver of Right to Remain Silent and Right to
Counsel During Interview, and the Court therefore con-
cludes that any statements made by the defendant to the
investigating officers was voluntary.

Defendant, however, relying on *State v. Thompson,* 287
N.C. 303, 214 S.E. 2d 742, contends that the trial judge failed
to consider the entire record in his determination of the volun-
tariness of defendant's in-custody statements. In *Thompson,* we
said:

> . . . [T]here was ample evidence that the procedural safe-
> guards required by *Miranda* were employed by the officers
> upon the taking of the statements from defendant. Never-
> theless, we must still determine whether, under all of the
> surrounding circumstances, defendant voluntarily and un-
> derstandingly made the inculpatory statements.
>
> *       *       *
>
> The fact that the defendant was youthful and that he
> made the challenged statements in the presence of police
> officers does not render the statements inadmissible, absent
> mistreatment or coercion by the officers. *State v. Lynch,*
> 279 N.C. 1, 181 S.E. 2d 561; *State v. Murry,* 277 N.C. 197,
> 176 S.E. 2d 738. Neither does a subnormal mentality, stand-
> ing alone, render a confession incompetent if it is in all
> other respects voluntarily and understandingly made. If a
> person has the mental capacity to testify and to under-
> stand the meaning and effect of statements made by him,
> he possesses sufficient mentality to make a confession.
> Nevertheless, his mental capacity, or his lack of it, is an
> important factor to be considered in determining the volun-
> tariness of a confession. . . .

Dr. Groce testified that, in his opinion, defendant knew the
difference between right and wrong on 24 January 1975. Dr.
Mildred Keene who testified that defendant suffered from
schizophrenia, paranoid type, also stated that on the occasions
that she observed defendant he seemed to be oriented as to time,
place and person. Further, she was of the opinion that defend-
ant might be oriented on one day and disoriented on the next
day.

Diagnosis of a defendant's mental condition as being schizophrenia, paranoid type, does not, standing alone, excuse him from legal responsibility for his criminal conduct. *State v. Potter,* 285 N.C. 238, 204 S.E. 2d 649. The above-summarized medical testimony bears upon whether defendant could have understandingly and voluntarily made these challenged statements. In addition to the medical testimony, there was non-expert testimony concerning defendant's ability to understand and relate at the time and place the inculpatory statements were made.

[8, 9] It is well recognized that a non-expert witness may testify as to his opinion of an accused's mental condition when the witness has had reasonable opportunity to observe the person and form an opinion based on such observations. *State v. Matthews,* 226 N.C. 639, 39 S.E. 2d 819; *State v. Nall,* 211 N.C. 61, 188 S.E. 637; *State v. Keaton,* 205 N.C. 607, 172 S.E. 179. Officer Crowell had ample opportunity to observe and talk with defendant before, during and after the time the challenged statements were made. It is noted that Dr. Groce's medical opinion related to 24 January 1975 and the non-expert testimony was based upon observations made on 25 January 1975. Further, we think it is significant that defendant's sister who was present at the time the statements were made and who was called as a witness failed to testify that defendant appeared to be disoriented or that he did not appear to understand the warnings given him or the consequences of the statements that he made. Thus, the trial judge's findings of fact were supported by the evidence and we are, therefore, conclusively bound by these findings. *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92; *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363. Neither do we find error in the fact that this evidence was admitted as a part of the State's rebuttal evidence. Admission of evidence in rebuttal, even when the evidence is properly admissible in chief, rests within the trial judge's sound discretion and his ruling thereon will not be disturbed absent a showing of gross abuse of that discretion. *State v. Foster,* 284 N.C. 259, 200 S.E. 2d 782; *State v. Mack,* 282 N.C. 334, 193 S.E. 2d 71. We hold that the trial judge did not err in admitting defendant's in-custody statements as a part of the State's rebuttal evidence.

[10] Defendant, relying upon *Mullaney v. Wilbur,* 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881, contends that the trial judge erred in instructing the jury that defendant had the burden of

proving, to the satisfaction of the jury, that he was legally insane at the time the offense was committed. He further argues that the trial judge should have charged the jury that the State had the burden of proving beyond a reasonable doubt that defendant was sane at the time the offense was allegedly committed. These identical contentions were fully considered and rejected in the recent case of *State v. Hammonds,* 290 N.C. 1, 224 S.E. 2d 595. We reaffirm the reasoning and holding set forth in *Hammonds.* See also *State v. Shepherd,* 288 N.C. 346, 218 S.E. 2d 176.

[11]  Finally, defendant contends that the court erred in denying his request to instruct the jury as to the provisions of G.S. 122-84.1.

In compliance with the provisions of G.S. 1-181 and before the judge began his instructions, defense counsel, *inter alia,* filed the following prayer for special instructions:

REQUEST FOR JURY INSTRUCTION

THE DEFENDANT respectfully requests this Court to charge the jury substantially as follows:

The provisions of North Carolina General Statutes, Section 122-84.1, copy of which is attached hereto and is incorporated herein by reference.

/s/ PAUL L. WHITFIELD
Attorney for Defendant

Sec. 122-84.1. Acquittal of defendant on grounds of mental illness; procedure.— (a) Upon the acquittal of any criminal defendant on grounds of mental illness, the trial court shall order the defendant held under appropriate restraint pending a hearing on the issue of whether the defendant is mentally ill and imminently dangerous to himself or others, as these terms are defined in Article 5A of this Chapter. The hearing shall be conducted in accordance with the provisions of G.S. 122-58.7 except that the hearing shall be held in a public courtroom and need not be closed to the public. Evidence adduced at the trial of the defendant on the criminal charges on the issue of mental illness shall be admissible at the hearing. If the hearing cannot be conducted prior to the termination of the ses-

sion of court in which the criminal trial was had, it shall be calendared in the district court in the same county within 10 days. If the court finds that the defendant-respondent is mentally ill and imminently dangerous to himself and others, it shall order him committed to a regional psychiatric facility designated by the Division of Mental Health Services for a period of not more than 90 days. The defendant shall thereafter be considered as though he had been committed initially under the provisions of Article 5A of this Chapter. If the court finds that the defendant is not mentally ill and imminently dangerous to himself or others, it shall order his discharge.

(b) The provisions of this section supersede those provisions of G.S. 122-84 which prescribe the procedures to be used in the case of a defendant acquitted of a criminal charge by reason of mental illness. (1973, c. 1437, s. 1.)

The trial judge did not instruct on the provisions of G.S. 122-84.1.

The question here presented is not a case of first impression. In the case of *State v. Bracy*, 215 N.C. 248, 1 S.E. 2d 891, the defendant was indicted for first-degree murder. His counsel argued the provisions of the statute which provided for the detention of a defendant in a State hospital and his discharge on certain conditions following a verdict of not guilty by reason of insanity. On the other hand, the solicitor argued that defendant would go free if the jury returned a verdict of not guilty by reason of insanity. Neither made any objection to the other's argument. Defense counsel requested the court to instruct according to his argument and his request was declined. On appeal, this Court found no error in the judge's ruling and quoted, with approval, the following from *State v. Matthews*, 191 N.C. 378, 131 S.E. 743:

". . . 'The jury has fully discharged its duty, and performed its functions, under the law of this State, when its members have sat together, heard the evidence, and rendered their verdict accordingly. As the judge must not invade the true office and province of the jury by giving an opinion in his charge, either in a civil or criminal action, as to whether a fact is fully or sufficiently proven (C.S.,

State v. Taylor

564), so the jury must be content to leave with the judge the grave responsibility imposed upon him to render a judgment, upon their verdict, according to law.' "

The identical question presented by this assignment of error was considered and decided in *State v. Hammonds, supra.* In *Hammonds,* the district attorney in his final argument to the jury told the jury that defendant would be back in his community if found not guilty by reason of insanity. The trial judge, without further elaboration, instructed the jury to disregard this remark. Prior to the court's charge, defendant submitted a written prayer for instruction explaining the procedure for commitment in the event of an acquittal on the ground of insanity. Defendant duly excepted to the trial judge's refusal to give the requested instructions. Justice Moore, speaking for a unanimous Court, after extensively reviewing the pertinent cases in this and other jurisdictions, in part, stated:

. . . To allow a jury to speculate on the fate of an accused if found insane at the time of the crime only heightens the possibility that the jurors will fall prey to their emotions and thereby return a verdict of guilty which will insure that defendant will be incarcerated for his own safety and the safety of the community at large. In the case before us, there could be no doubt in the jurors' minds that defendant murdered Mr. Capel. There was considerable evidence that defendant was incapable of knowing right from wrong at the time he killed Mr. Capel, and also evidence that his mental condition would worsen with age. The jury's questions on a recommendation of mercy indicate their sympathy for defendant's condition. However, an overriding fear for the safety of the community could well have dictated their verdict in the absence of any information that defendant could be committed to a mental hospital if found not guilty by reason of insanity. The atmosphere was one of confusion and of uncertainty. To insure fairness to defendant and to get the trial back "on an even keel," the trial judge, upon request by defendant, should have instructed the jury on the consequences of a verdict of not guilty by reason of insanity.

We hold, therefore, that, upon request, a defendant who interposes a defense of insanity to a criminal charge is entitled to an instruction by the trial judge setting out

in substance the commitment procedures outlined in G.S. 122-84.1, applicable to acquittal by reason of mental illness. The failure to give such instruction in this case was prejudicial error, entitling defendant to a new trial. *To the extent this opinion is in conflict with State v. Bracy,* [215 N.C. 248, 1 S.E. 2d 891], *that decision is modified. . . .* (Emphasis ours.)

The holding in *Hammonds* squarely controls this assignment of error and upon authority of that case, this assignment of error is sustained. For failure of the trial judge to give the requested instruction, there must be a

New trial.